**SIGNED this 3rd day of April, 2017**

_Shelley D. Rucker_
Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT FOR
## THE EASTERN DISTRICT OF TENNESSEE
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **Elbert Donald Walker** | ) | **Case Nos: 1:13-bk-13184-SDR** |
| **Rhonda Pitts Walker** | ) | **Chapter 7** |
| Debtors | ) | |
| | ) | |
| **James R. Paris, Trustee** | ) | |
| Plaintiff | ) | **Adversary Proceeding** |
| | ) | **Case Nos: 1:15-ap-1078-SDR** |
| **v.** | ) | **1:15-ap-1051-SDR** |
| | ) | |
| **Cindy Walker, Individually, and** | ) | |
| **Cindy Walker, Trustee of the Cindy** | ) | |
| **Michelle Walker Revocable Trust, and** | ) | |
| **Cindy Michelle Walker, Trustee** | ) | |
| Defendants | | |

Counsel for Plaintiff:       Richard P. Jahn, Jr.
                             Nancy A. Cogar

Counsel for Defendants:      Tamra B. Ferguson
                             R. Dee Hobbs
                             Gregory Evan Van Houten

1

**Memorandum Opinion on Trustee's and Defendants' Motions for Summary Judgment**

I.        **Background Facts and Procedural History**

A.        *The Pleadings*

The Chapter 7 Trustee, James R. Paris, ("Plaintiff" or "Trustee"), filed a complaint in this adversary proceeding on June 17, 2015.[1]  [Doc. No. 1].  An amended complaint was filed on October 27, 2015.  [Doc. No. 31].  The amended complaint seeks substantive consolidation pursuant to 11 U.S.C. § 105 of certain real estate assets held by Cindy Walker, individually, and Cindy Walker, Trustee of the Cindy Michelle Walker Revocable Living Trust, (together, "Defendants") with those of her parents, the debtors, Elbert and Rhonda Walker ("Debtors").[2] [Doc. No. 31, at 13].  The amended complaint also seeks as alternative relief the avoidance of certain transfers of real estate between the Debtors and the Defendants, the establishment of a resulting trust, and/or the payment by the Defendants of the balance owed for the purchase of each house.  [Doc. No. 31, at 15-17].  The Defendants filed an answer on November 30, 2015. [Doc. No. 38].

The Trustee has filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56, as incorporated into bankruptcy adversary proceedings by Fed. R. Bankr. P. 7056.  [Doc. No. 107]. The Defendants oppose the motion for summary judgment.  [Doc. No. 115].  The Defendants have also filed a motion for partial summary judgment [Doc. No. 111], which the Trustee

---

[1] The Trustee previously filed an adversary proceeding to recover two properties from Cindy Walker, which was consolidated with this one on September 20, 2016.  [*Paris v. Walker*, Case No. 1:14-ap-1051-SDR, Doc. No. 57]. Those properties are included in this adversary proceeding.  All docket citations in this opinion refer to Case No. 1:15-ap-1078-SDR unless otherwise noted.

[2] Because several of the parties share the same surname, the court will sometimes refer to the parties by their given name for clarity's sake.  The court intends no disrespect.

opposes.  [Doc. No. 112].[3]  The parties have prepared extensive briefs accompanied by affidavits and thousands of pages of exhibits and deposition transcripts.

### B.    The Trustee's Claims and Theories of Recovery

At issue in this case are sixteen houses that were acquired by or transferred to Cindy Walker or her trust.  The Trustee alleges that the transfers were made directly from one or both Debtors or were purchased by Defendants with money obtained from one or both Debtors. These houses may be sorted into three groups based on the Trustee's theory of recovery.  First, there are five houses transferred to Cindy Walker by Rhonda Walker in 2007 ("2007 Transfers").[4]  Second, there are five additional houses transferred to Cindy Walker by Rhonda Walker in 2008 ("2008 Transfers").[5]  Finally, there are the remaining properties, which were acquired by or transferred to Cindy Walker or her trust within two years of the Debtors' bankruptcy filing on June 28, 2013 ("Two-Year Transfers").[6]

---

[3] The Defendants also filed a motion to file a sur-reply and a sur-reply [Doc. No. 118] in response to the Trustee's argument that the expert rebuttal report submitted by Jack London, CPA, was inadmissible because it was unsworn. [Doc. No. 112, at 6].  Attached to the motion were affidavits from Defendants' counsel, Tamra Ferguson, and sworn letters from Mr. London and Matthew Stelzman, as well as copies of emails pertaining to the creation of the rebuttal report.  The Defendants then filed a number of affidavits and exhibits that were essentially duplicative of items previously filed.  [Doc. Nos. 119-120].  The Trustee filed an objection in response to the motion to file a sur-reply and asked that the exhibits and affidavits at Doc. Nos. 118, 119, and 120 be stricken.

Upon review of these filings, the court will grant the Defendants' motion to file a sur-reply and deny the Trustee's motion to strike.  The court finds that some of the filings are unnecessary or duplicative.  Of the attachments, the only one that the court considered relevant to its determination of the motion for summary judgment was the sworn letter of Mr. London in which he avers that he "wrote the rebuttal expert report, with help from Matthew Stelzman" and that "[t]he opinions in the report are mine." [Doc. No. 118-2].  The court agrees with the Trustee's assessment that the letter appears to be an attempt to avoid the problems with the Defendants' failure to include Mr. London's affidavit with the rebuttal report.  The court has granted the Trustee some latitude with the production of his expert's report given the magnitude of the discovery retrieved and to be reviewed in this case.  [Doc. No. 101, Order on Defendants' Motion to Exclude Plaintiff's Expert Report and Testimony].  The court will grant similar latitude to the Defendants.  For the purposes of this motion for summary judgment, the court has considered the statements made by Mr. London in his rebuttal report as being sworn statements based on his sworn letter.

[4] These houses are located at 136 Brently Woods Drive, 206 Brently Woods Drive, 6841 Robin Drive, 2604 Standifer Chase Drive, and 1029 Fuller Glen Circle. [Doc. Nos. 109-3, at 22; 111-1, at 3].
[5] These houses are located at 2508 Standifer Oaks Road, 8812 Standifer Gap Road, 2341 Standifer Gap Road, 4911 Maryland Drive, and 705 Gleason Terrace Court. [Doc. Nos. 109-3, at 30-38; 111-1, at 3].
[6] These houses are located at 1609 Bush Road, 4044 Homer Street, 142 Brently Woods, 9004 Fuller Glen Circle, and 6861 Standifer Gap Road.  [Doc. Nos. 109-3, at 52-178; 111-1, at 4-5].

The Trustee asks the court to grant summary judgment based on three theories.[7] First, he seeks that fifteen of the sixteen houses involved in this suit be substantively consolidated with the Debtors' estates. [Doc. No. 107-2, at 2]. Alternatively, the Trustee seeks that the same fifteen house transfers be avoided and brought into the Debtors' estates as fraudulent transfers. [*Id.* at 3]. As a third theory of relief, if the court were to find that the Defendants' ownership of the houses should not be substantively consolidated or is not the result of fraudulent transfers, the Trustee asks the court to order that unpaid purchase obligations for the fifteen houses and applicable net post-petition rents owed by Defendants be reduced to money judgments. [*Id.*]. Finally, the Trustee seeks a judgment that the note signed by Cindy Walker on August 3, 2009, as to the sixteenth house, 2210 Red Tail Lane, be declared valid, due and owing, and enforceable; and that a judgment be entered for the balance due on the note as of August 31, 2016 in the amount of $286,682. [Doc. No. 107-2, at 13-14].

In support of his motion, the Trustee has provided an affidavit as custodian of the Debtors' pre-petition books and records along with copies of relevant personal and business bank account records, accompanied by affidavits from the respective banks authenticating the bank account records; financial records; tax returns; and other records, including client trust accountings; property records; and notes he has obtained through his investigations of the Debtors' assets and liabilities. [Doc. No. 108]. Attached to his statement of undisputed facts, the Trustee has provided the deposition testimony of Cindy Walker, Don Walker, Rhonda Walker, John Ramsey, and Janice Long, a longtime employee of the Walker's businesses, along with their deposition exhibits. [Doc. No. 110]. Finally, the Trustee has also provided an affidavit and report prepared by his expert, Mr. Spence Shumway, CPA, in which Mr. Shumway

---

[7] The Trustee's amended complaint seeks relief on four counts; however, he has moved for summary judgment on only three. [Doc. No. 31, at 13-17; Doc. No. 107, at 2.] The Trustee has not moved for summary judgment under his alternative theory of resulting trust. [Doc. No. 107, at 2].

4

has analyzed the books and records of the Debtors, who also acted as the property managers for

Cindy Walker. [Doc. No. 109].  Mr. Shumway has calculated the amounts that he contends the

Defendants owe to one or both of the Debtors for the purchase of the sixteen properties.  The

Trustee contends that if the transfers are not avoided, then he is at least entitled to a judgment for

the amount owed by the Defendants to the Debtors under their theory of the case.

### C. The Defendants' Defenses and Theories for Dismissal

The Defendants also seek a partial summary judgment on all counts in the amended

complaint except a judgment for some funds paid toward two properties in May of 2013.  [Doc.

No. 111-1, at 2].  Specifically, the Defendants contend that all but five of the fraudulent transfer

claims are barred by the applicable statute of limitations.  [Doc. No. 111-1, at 2].  Second, the

Defendants contend that the court, as a matter of law, does not have equitable authority under 11

U.S.C. § 105 to use substantive consolidation or some other equitable theory, such as a resulting

trust, to recover assets whose recovery is otherwise barred by the applicable statutes of

limitation.  [*Id.*].  Third, as to any fraudulent transfer claim, the Defendants contend that the

Trustee has failed to show that the transferors i.e., the Debtors, were insolvent at the time the

transfers were made.  [*Id.*].  The Defendants contend that the Trustee failed to prove that required

element of his cause of action and that they are consequently entitled to summary judgment on

any claim which requires such a showing.  Those causes of action would include all of the

constructive fraudulent transfer claims under federal bankruptcy or state law.  Fourth, the

Defendants contend that the undisputed facts do not support a finding that Cindy Walker should

"be stripped of her property."  [*Id.* at 3].  Finally, the Defendants contend that the Trustee is not

entitled to summary judgment because he has failed to support his claim that a specific amount is

owed with admissible evidence and that his motion for summary judgment relies only on allegations.  [*Id.*].

In support of their motion for partial summary judgment, the Defendants have attached, *inter alia*, Mr. Shumway's deposition and his initial and final report, a calculation of the 2007 note balance using a 3% interest rate, an expert rebuttal report from Mr. Jack London, CPA, and the same depositions of Cindy Walker, Don Walker, and Rhonda Walker included with the Trustee's motion. [Doc. No. 111].

## II.    Jurisdiction

The court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(H) as well as the general order of reference entered in this district.  The parties have agreed that this is a matter related to the bankruptcy proceeding and have consented to this court entering a final order in this matter.  [Doc. No. 56].

## III.    Standard for Summary Judgment

Federal Rule of Bankruptcy Procedure 7056 makes Federal Rule of Civil Procedure 56 applicable to bankruptcy adversary proceedings.  *See* Fed. R. Bankr. P. 7056.  Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The burden is on the moving party to show conclusively that no genuine issue of material fact exists, and the court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *60 Ivy Street Corp. v. Alexander*, 822

F.2d 1432, 1435 (6th Cir. 1987); *Kava v. Peters*, No. 09-2327, 2011 WL 6091350, at *3 (6th Cir.

Dec. 7, 2011).

Once the moving party presents evidence sufficient to support a motion under Fed. R.

Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations.  The

nonmoving party is required to come forward with some significant probative evidence which

makes it necessary to resolve the factual dispute at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986); *60 Ivy Street*, 822 F.2d at 1435.  The moving

party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing

on an essential element of the nonmoving party's case with respect to which the nonmoving

party has the burden of proof.  *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220

(6th Cir. 1996).  "If the court does not grant all the relief requested by the motion, it may enter an

order stating any material fact . . . that is not genuinely in dispute and treating the fact as

established in the case."  Fed. R. Civ. P. 56(g).

## IV.    Disputed and Undisputed Facts

### A.    *Objections to the Admissibility of Certain Undisputed Facts*

In response to the Trustee's motion for summary judgment, the Defendants argue that the

Trustee's statement of undisputed facts and supporting affidavits should be stricken.  [Doc. No.

115, at 12].  The Defendants raise a number of alleged deficiencies with the Trustee's statement

of undisputed facts, including that: (1) it relies heavily on the Trustee's affidavit, which the

Defendants contend was not based on the requisite personal knowledge; (2) it fails to include

citations to admissible evidence in the record; (3) it may rely on materials produced after the

discovery deadline; and (4) it improperly discusses Rhonda Walker's Tennessee Investment

Services Trust ("TIST") in violation of a prior settlement agreement.  [*Id.* at 12-17].

In support of his motion for summary judgment, the Trustee filed a statement of
undisputed facts, which included as exhibits the Defendants' written responses under oath to
discovery and production; the depositions of Cindy Walker, Don Walker, Rhonda Walker, Janice
Long, and John Ramsey; and Schedule C of Cindy Walker's 2010 federal tax return. [Doc. No.
110, Ex. Nos. 10-18]. The Trustee also filed the affidavit of Mr. Shumway, including his expert
report and curriculum vitae. [Doc. No. 109]. Attached as exhibits to Mr. Shumway's report
were various relevant records including, *inter alia*, bank account records, general ledgers, tax
returns, and property records. [Doc. No. 109, Ex. B]. The appendixes to Mr. Shumway's report
provide a narrative summary as well as detailed citation to the underlying documents related to
each transaction at issue. [Doc. No. 109, Ex. B., Appx. B-F].

The Trustee also filed his own affidavit to which he attached as exhibits various records.[8]
[Doc. No. 108]. In his affidavit, the Trustee stated, "As Trustee I am custodian of all the pre-
petition books and records of the Debtors, including their numerous personal and business bank
account and financial records, tax returns, and other records, including client trust accountings,
property records and notes." [Doc. No. 108, at 1-2]. The Trustee then included a summary of
the various and "voluminous" records, which he averred he "spent numerous hours reviewing . . .
and . . . am personally familiar with . . . ." [*Id.* at 6]. These records included, *inter alia*, the
Debtors' bank account records, the Debtors' business and litigation records, the Debtors'
property records, the Debtors' FirstBank loans, the documents related to the house transfers at
issue in this case, the documents related to Rhonda Walker's TIST, Cindy Walker's tax returns

---

[8] These records include: (1) Exhibit 1 – Cindy Walker Trust Account General Ledger 2009 – June 2013; (2) Exhibit
2 – Chart summarizing TIST deposits and TIST bank statements; (3) Exhibit 3 – 2011 Statements for Rhonda
Walker TVFCU Account # 6749; (4) Exhibit 4 – 2011 Statements for Cindy Walker TVFCU Account # 3393; (5)
Exhibit 5 – August – December 2011 Statements for Rhonda and Cindy Walker Joint First TN Bank Account #
8330; (6) Exhibit 6 – 2013 Statements for Brent Walker First TN Savings Account # 832; (7) Exhibit 7 – 2011
Statements for Walker Joint Personal FTN Bank Account # 836; (8) Exhibit 8 – James Paris Affidavit and Exhibits
in adversary proceeding Case No. 14-1051; (9) Exhibit 9 – Cindy Walker Cash Flow Summary. [Doc. No. 108,
Exhibits].

for 2009 – June 2013, Cindy Walker's client trust account, and the Debtors' assets and liabilities as of the petition date. Not all of these documents were attached as exhibits to the Trustee's affidavit. Those that were not but which were related to Mr. Shumway's calculation of the amounts owed were included as attachments to Mr. Shumway's affidavit and report. Others were attached as exhibits to the Trustee's statement of undisputed facts. The Colemere deed and the documents related to the Debtors' litigation with FirstBank were not attached. The Trustee's affidavit provided a narrative summary of the records themselves as well as the Trustee's conclusions based on his review of the records. The Trustee's affidavit identified the items attached as exhibits, but for the most part did not include specific citations to the record to support his statements.

The Defendants filed a response to the Trustee's statement of undisputed facts. [Doc. No. 115-2]. In response to each statement made in the Trustee's undisputed facts that relied for support on the Trustee's affidavit, the Defendants have objected that the statement is either "unsupported" or "agreed but unsupported." [*Id.*]. For the items denoted only as "unsupported," the Defendants have not explained whether they dispute the fact as proffered by the Trustee. In none of these instances, whether denoted as "unsupported" or "agreed but unsupported," did the Defendants proffer countervailing evidence or explain a dispute with the Trustee's statement of fact. The Defendants object that the Trustee's affidavit is not based on his own personal knowledge of the alleged facts. [Doc. No. 115, at 14]. The Defendants further object that while the statement of undisputed facts cites to the Trustee's affidavit, the affidavit itself does not then cite to evidence in the record. [Doc. No. 115-1].

Federal Rule of Civil Procedure 56(c), which outlines the procedures for supporting factual positions in connection with a motion for summary judgment, provides that:

(1) A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

    (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

    (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Affidavits filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). These requirements are mandatory, and an affidavit not satisfying Rule 56(c)(4) may be subject to a motion to strike. *In re Thomas Homes, LLC*, No. 09-32553, 2012 WL 122539, at *5 (Bankr. E.D. Tenn. Jan. 17, 2012) (citing *Collazos–Cruz v. United States,* 117 F.3d 1420 (Table), 1997 WL 377037, at *2 (6th Cir. 1997)).

The Defendants first argue that the Trustee's affidavit is not "made on personal knowledge" as required by Fed. R. Civ. P. 56(c)(4). [Doc. No. 115, at 14]. The Defendants contend that the Trustee's status as the custodian of the Debtors' pre-petition books and records does not imbue him with personal knowledge sufficient to support his affidavit and neither does his personal review of the records. [*Id.*].

After reviewing the Trustee's affidavit and exhibits, the court is satisfied that the affidavit is based on the Trustee's personal knowledge, sets out facts that would be admissible in evidence, and shows that the Trustee is competent to testify on the matters stated. *See* Fed. R. Civ. P. 56(c)(4). The Trustee's affidavit relies on and summarizes the Debtors' pre-petition

books and records, of which the Trustee is custodian.  *See In re Southern Indus. Banking Corp.*,

189 B.R. 697, 703 (E.D. Tenn. 1992) ("Mr. DuVoisin made his affidavit on the basis of [the

debtor corporation's] records, of which he was the custodian because of his appointment as the

debtor's liquidating trustee.  He therefore had personal knowledge of what the records in his

custody showed.").  Moreover, the Trustee's affidavit is not based only on his status as custodian

of the records, but is based on his actual personal review of the records.  Having reviewed in

great detail the voluminous materials provided by the Trustee in this case, the court is satisfied

that the Trustee has conducted a thorough investigation of the records sufficient to confer on him

the requisite personal knowledge to satisfy Fed. R. Civ. P. 56(c)(4).  The court is not persuaded

by the Defendants' apparent argument that the Trustee must have gained his personal knowledge

contemporaneously with the signing of the checks, the creation of the accounting records, or the

execution of the legal documents at issue in this case.  *See In re Southern Indus. Banking Corp.*,

189 B.R. at 703.  The court is satisfied that the Trustee's review of the business records in this

case satisfies the personal knowledge requirement of Fed. R. Civ. P. 56(c)(4).  S*ee Farnhurst,

LLC v. City of Macedonia*, Case No. 5:13-cv-668, 2016 WL 524361, at *2-3 (N.D. Ohio Feb. 10,

2016) (citing *Clark v. Main St. Acquisition Corp.*, 553 F. App'x 510 (6th Cir. 2014)).

        The Defendants' argument that the court should strike the Trustee's statement of

undisputed facts also fails because the court finds that the Defendants' responses to certain

statements as being "unsupported" or "agreed but unsupported" are insufficient under Fed. R.

Civ. P. 56(c)(1).  These responses do not assert "that a fact cannot be or is genuinely disputed"

and appear to the court to favor form over substance.  *See* Fed. R. Civ. P. 56(c)(1).  The court in

particular takes a dim view of Defendants' position that they agree to the veracity of certain facts

put forward by the Trustee but nevertheless object that the facts are unsupported.  The

11

Defendants may of course object to the admissibility of certain evidence.  However, as to the Trustee's affidavit, the Defendants do not point to any rule of evidence that would make it inadmissible.  Nor do they come forward with their own countervailing evidence or explain their genuine dispute with the accuracy of the Trustee's statement of facts.  If the Defendants agree that a certain fact is true, it is an undisputed fact for purposes of summary judgment, and the court has included it as such in its statement of facts.  Where the Defendants have simply denoted a fact as unsupported, the court finds that they have not come forward and referred the court to materials in the record showing that the fact cannot be or is genuinely disputed.  In its statement of the facts, the court has supplied citations to the Trustee's materials showing support for the proffered fact. Where the court has been unable to locate support for the statement, it has not been included.

Again putting form over substance, the Defendants object that the Trustee "has not indicated where in the record many of his alleged facts can be found, or even *if* they can be found."  [Doc. No. 115, at 15 (emphasis in original)].  In its review of the materials submitted by the Trustee in support of his motion for summary judgment, the court had no such trouble.  The Trustee has included the documents, such as bank account records, general ledgers, depositions, and property records, upon which his motion for summary judgment relies as exhibits to his statement of undisputed facts, his affidavit, and Mr. Shumway's affidavit and expert report.  Although the court acknowledges that the Trustee failed to include complete citations to the record in his affidavit, the court had no difficulty locating in the record the items referred to by the Trustee.  While perhaps the Trustee's affidavit could have employed a second-level citation to the record, the court will not strike the Trustee's affidavit on this basis.

12

The Defendants also contend that the Trustee improperly provided a number of documents to the Defendants following close of discovery. [Doc. No. 115, at 15]. The Defendants allege that some 15,131 pages of documents were given to them by the Trustee at the same time that the Trustee submitted Mr. Shumway's second report. [*Id.* at 16]. The Defendants appear to acknowledge that the documents were not filed with the court as exhibits to Mr. Shumway's report, and the Trustee denies that the documents were relied on to support the Trustee's motion for summary judgment. [Doc. No. 122, at 6-8]. Consequently, the court does not ascertain a current dispute between the parties. To the extent that the Trustee may rely in the future on documents that were produced beyond the discovery deadline, the court will address that matter when it presents itself. As the record stands now, the Defendants have not shown that the Trustee's motion for summary judgment relies on materials produced beyond the discovery deadline.

Finally, in the Defendants' response to the Trustee's statement of undisputed facts, the Defendants objected "to any reference to Rhonda Walker's TIST due to the release granted to Cindy (and others) in the settlement agreement related to that release." [Doc. No. 115-2, at 2]. In the Defendants' response to the Trustee's motion for summary judgment, they claim that these objections are based on a settlement agreement related to the TIST that releases "each of the Walkers*, including Cindy*, 'from any and all actions, claims . . . , damage and indemnities of every kind or nature whatsoever . . . the Trustee had, ever may have, own or hold, . . . whether based on contract, tort, statutory or other legal or equitable theory of recovery, in any way related to or arising from the TIST, any property held therein, and any actions on behalf of the Release Parties related to the same.'" [Doc. No. 115, at 14 (emphasis added)]. The Trustee responded that the settlement agreement did not release Cindy [Doc. No. 122, at 5], and the Defendants

13

filed a supplemental response in which they admit their mistake.  [Doc. No. 123].  Although the

court notes that the Defendants have not amended their responses to the Trustee's statement of

undisputed facts related to the TIST, the court ascertains that there is no longer a basis for

dispute to object to these facts as inadmissible based on the settlement related to Rhonda

Walker's TIST.  As argued by the Trustee, the release in the Rhonda Walker TIST settlement

does not prevent the use of these facts in litigation that might create liabilities for Cindy Walker.

  For the foregoing reasons, the court will not strike the Trustee's statement of undisputed

facts, the Trustee's affidavit, or Mr. Shumway's affidavit.

### B. *Facts*

  The court will now address what it considers to be the undisputed facts before it. The

parties filed a formal stipulation of facts.  [Doc. No. 70].  In addition, they have agreed to a

number of undisputed facts which the court recites below.  Where the parties have raised a

genuine dispute, the court has noted that the issue is disputed.  As set out above, where the

parties have agreed that a fact is true, whether or not they contested it as unsupported, the court

has included the fact as undisputed.  Where the parties have only objected that a fact is

unsupported, the court has endeavored to supply the citation to the record.  Where the court has

been unable to find support in the record, the fact has been omitted or treated as disputed.

  As a short-hand citation format, the numbers used in citations to the facts correspond to

the paragraph numbers in the Trustee's statement of undisputed facts and the Defendants'

responses thereto.  [Doc. Nos. 110, 115-2].  The references to the Defendants' responses to the

Trustee's first statement of undisputed facts are denoted below by "#" and the corresponding

paragraph number.  On November 3, 2016, the Trustee filed a supplemental statement of

undisputed facts [Doc. No. 112-1] to which the court has found no response.  The supplemental

facts are indicated by "S#" and the corresponding paragraph number.  The court has treated those

facts as undisputed.  Statements from the Trustee's response to the Defendants' statement of

undisputed facts [Doc. No. 117] are designated by "D#" and the paragraph number.  The court

has also tried to employ the exact language used by the parties in their statements.

At all times from 2007 on, Don and Rhonda Walker maintained a property management

company.  [#2].  This company managed rental properties for a number of individual clients and

some family members of the Walkers, including Cindy Walker.  [#3].  The management

company maintained a client trust bank account at First Tennessee Bank with an account number

ending in . . . 1961.  [#4].  Since 2007, Don and Rhonda Walker have acted with Cindy Walker's

power of attorney.  [D#18].

From 1995 until 2006, a few properties were transferred to Cindy Walker.  The parties

dispute whether they were "for consideration" or not.  The Trustee contends that they were for

no consideration.  [Doc. No. 31, at ¶11; D#1].  The first property was 300 N. Moore Road in

1995.  [D#3].  The Trustee's statement of undisputed facts contains a number of statements about

the Walkers' financial dealings with First Bank beginning in 2006 and the financial problems

with Don Walker's partnership, D&W Properties.  The Defendants object to these facts as

unsupported but provide no evidentiary basis for dispute.  [D#6-10].  The court notes that the

Trustee testified to these transactions based on his review of the Debtors' documents, litigation

files, and proofs of claims in the case.  [Doc. No. 108, ¶16(c), (e), (f), (g), (h)].  The Defendants

also object to the Trustee's statement that in 2007 and 2008 the real estate market went into

recession and the Georgetown lots did not sell as unsupported.  [#11].  While the specifics of

D&W's Georgetown Bay project would need support, the housing market collapse in 2008

followed by the Great Recession are facts that may well be subject to judicial notice.

In 2007, Cindy Walker purchased a house at 855 Fuller Glen for $48,772.32 out of money she received from a $65,000 loan from Volunteer Bank. [D#9]. In December of 2007, she purchased 1603 Eucalyptus for $50,000 from William Kelley using money advanced to her by Don Walker in the amount of $17,000, which Cindy repaid with the remaining money from the Volunteer Bank loan. [D#11; Stipulation of Certain Facts, Doc. No. 70, at 2]. In November 2007, Rhonda Walker transferred five houses out of her trust into the name of Cindy Walker, her daughter. [#18]. The parties dispute whether this was pursuant to an unwritten seller-financing agreement that provided that Cindy would repay Rhonda with the rental income on the properties Cindy owned. [D#4]. Cindy Walker agreed that she was purchasing the houses from Rhonda, but Cindy had no input as to the price. [#19]. The five houses transferred in November 2007 were 1029 Fuller Glen Circle, 206 Brentley Woods Drive, 136 Brentley Woods Drive, 2604 Standifer Chase Drive, and 6841 Robin Drive (defined by the court *supra* as the 2007 Transfers). [#20].

Cindy Walker was a teacher in Europe when these houses were transferred to her. [#21]. She left the details of the 2007 purchase to her mother, including price, terms, and payments. [#159]. No note or other agreement regarding the transfer was generated. [#22]. With regard to the 2007 Transfers, there is no writing or formal agreement between Rhonda Walker and Cindy Walker. [#32]. The purchase price that Cindy was to pay her mother for the 2007 Transfers was $383,600. [#25, 158]. She has no documents to substantiate any down payment that she made towards the purchase of the 2007 Transfers. [#160]. Cindy Walker does not know where any down payment fund would have been held or when it would have been liquidated. [#161]. Cindy Walker's 2007 and 2008 tax returns show no sales of securities or other personal property belonging to her. [#162]. Nevertheless, Rhonda Walker testified that a mutual fund in hers and

Cindy's name was cashed out and $125,000 was applied to the debt. [Rhonda Walker Dep., 6/13/2016, Doc. No. 110-6, at 52-56].

The family accountant, John Ramsey treated the 2007 Transfers to Cindy as occurring on January 1, 2008, for tax purposes. After the transfers, rental income from the five houses was deposited to the Don Walker Client Management Trust account, specifically to Cindy Walker's subaccount, beginning in January 2008. [#27]. These rental incomes were used to maintain the five properties and to pay obligations on other property that Cindy Walker owned. [#28]. Rhonda Walker kept no accounting of payments towards the 2007 Transfers obligation, but claims she applied annual gift tax credits towards Cindy's obligation for the 2007 houses. [#163]. Rhonda Walker withdrew $47,606.90 in the form of six checks from Cindy's rental account between July 22, 2009, and December 10, 2010, and Cindy claims these were payments to Rhonda for the 2007 Transfers. [#164]. Rhonda claims that when Cindy sold a house in 2010 at 7736 Colemere, the proceeds check for $78,229.42 went to her to pay the 2007 Transfers debt, but she has no other evidence to support this. [#165]. The Trustee disputes this accounting of payment. He contends that the Colemere sale proceeds were paid to Don Walker Construction for construction of the Colemere house after the purchase of the lot. The Colemere transaction is discussed in more detail below. Nevertheless, for purposes of this summary judgment motion, the Trustee does not dispute that any obligation to pay for the 2007 Transfers should be credited with $87,058. [D#39].

Cindy Walker's trust account records for 2008 are unavailable to confirm rental deposits from these properties. [#29]. The bookkeeper, Ms. Long, testified that a computer crash had occurred in 2009 that resulted in the destruction of the records for the client accounts for the years 2007 and 2008. [Janice Long Dep., 4/4/2016, Doc. No. 110-7, at 18]. There is evidence of

a computer crash in 2009 at Walker Management and a fire at the Walker residence in March

2014, but Cindy's income tax returns are available for 2007 and 2008 to show her income and

sources and any sales of investment assets. [S#1]. In 2007, her net rental income before

depreciation was $32,696. [S#2]. For 2007, her tax return showed she had no interest income,

and that she had no sales of investment properties or securities. [S#3].

Cindy Walker took no part in making management decisions about the 2007 Transfers.

[#30]. Cindy Walker had given Don Walker her power of attorney, which he could use to buy or

sell properties for her. [#31]. Rhonda Walker also acted on her behalf with a power of attorney.

[#31; D#18]. Rhonda Walker testified that the 2007 note was paid off. [D#7; Rhonda Walker

Dep., 6/13/2016, Doc. No. 110-6, at 49-52]. The Trustee disputes that the obligation for the

2007 Transfers was satisfied and characterizes the date as being the "goal" Rhonda and Cindy

had for the obligation to be paid. [D#7; Rhonda Walker Dep., 6/13/2016, Doc. No. 110-6, at 60].

None of the houses transferred to Cindy from 2007 on were meant to be gifts to her.

[#178]. Although this statement was agreed to by the parties, the court finds its meaning

ambiguous but critical to the court's analysis. Based on the arguments made by opposing

counsel, the court concludes that the parties have a genuine dispute as to this statement. The

Trustee argues that the parents never intended to give the 2007 houses to Cindy; they were

simply parking the houses there to keep them away from creditors. Based on the Defendants'

arguments, it appears that they could be making the point that the houses were not gifts because

Cindy was obligated to pay her mother or father for them. In fact, Cindy intended to pay her

parents for all of these houses. [D# 43-51]. The Trustee disputes this declaration of her intent

since she was not involved in many of the transactions, there were no written agreements as to

the terms, and no compliance with what writings there were. Given the parties' disputes as to the

very nature of these transactions, the court considers the reason for the transfers and the parties' intentions to be the most material factual determination in this case. That will require the court to hear the testimony and evaluate the credibility of the witnesses.

On October 1, 2008, Rhonda Walker transferred five more houses to Cindy Walker from her Revocable Trust. [#33]. These houses are 4911 Maryland Drive, 8812 Standifer Gap Road, 705 Gleason Terrace Court, 2508 Standifer Oaks Road, and 2341 Standifer Gap Road (defined by the court *supra* as the 2008 Transfers). [#33]. With regard to the 2008 Transfers, there was no writing or formal agreement between Rhonda Walker and Cindy Walker except a note dated August 2, 2008, for $349,000. [#35; D# 5]. The Walkers have advised the Trustee that Cindy was to pay $455,000 for the 2008 Transfers, with $106,000 down and a note for $349,000. [#36]. The Defendants dispute this through their contention that Cindy provided money from the sale of bonds for a down payment of $106,000 in 2008. [Rhonda Walker Dep., 6/13/2016, Doc. No. 110-6, at 64-65, 70-71].

The Trustee disputes the Defendants' statements that Cindy obtained the houses pursuant to a "seller-financing" agreement. The only document provided by either party is a note which does not reference any specific properties being involved in the transaction. [D#5]. As noted above, the parties dispute whether the down payment was made by Cindy with some funds that were hers or whether Rhonda Walker simply characterized another gift of her own property as the down payment. [#172; #173; #180; Rhonda Walker Dep., 6/13/2016, Doc. No. 110-6, at 64-65, 69-71, 74-75]. No event is reported on Cindy Walker's 2007, 2008, or 2009 federal tax returns for any sale of any bonds or other securities. [#174]. Specifically, her tax returns for 2008 show that she had net rental income before depreciation in the amount of $54,412. [S#4].

She reported no interest income and no sales of her investment properties or securities during 2008.  [S#5].

With respect to the 2008 Transfers, on August 2, 2008, Cindy Walker signed an unsecured note payable to the order of Rhonda P. Walker, trustee of the Rhonda P. Walker Revocable Living Trust in the original principal amount of $349,000.  [#37]. The August 2, 2008 note called for monthly payments of $2,410.13 to begin in 2011 to Rhonda Walker, but Cindy Walker never made payments in that amount prior to the petition.  [#38].  The Defendants contend and the Trustee acknowledges that she made sporadic payments prior to the bankruptcy filing with her mother's permission.  [D#8].  Based on the references in the responses and the charts in Mr. Shumway's report, it appears that there were no other prepetition payments. Rhonda testified that there were no payments made other than the proceeds from the bond (which is in dispute) and the withdrawals from Cindy's management account (which the Trustee has credited toward the 2007 Transfers for purposes of the motion for summary judgment). [Rhonda Walker Dep., 6/13/2016, Doc. No. 110-6, at 66].

Both parties attached a copy of the 2008 note in support of the motions.  The two exhibits are identical.  [Doc. No. 109-3 at 34; Doc. No. 111-5].  The note provides that payments will begin no later than January 1, 2009.  The Trustee denies the Defendants' contention that payment was not required until 2011.  [D#6].  Rhonda Walker testified that the 2011 date was selected because that is when she expected Cindy to have paid off the 2007 purchases.  [D#6].  Only interest was due in the years 2009 and 2010.  The note also provides that on January 1st of each year the outstanding principal balance will be reduced by the annual exclusion gift amount under IRC Section 2503(b).  It also provides that should the Holder or Donald Walker pass away before the note is paid in full, the note shall be deemed to be paid in full to the extent such

amount shall not cause any gift tax to be due or owing.  If the note goes into default, then Cindy

is also liable for reasonable attorney fees and the cost of collection. The note provides that if any

of the properties securing the note are sold then the entire balance could be accelerated at the

lender's option.  However, neither party provided evidence of a security interest being granted in

any properties to the Trust.

      The 2008 Transfers appeared for the first time on Cindy's 2009 return for tax purposes.

[#39; Doc. No. 113-2, 2009 Federal Tax Return, Schedule E, at 80-85].  Rental income from the

five houses transferred to Cindy Walker in 2008 began to be deposited into the Don Walker

Client Trust Account in Cindy's sub-account in 2009.  [#40; Janice Long Dep., 4/14/2016, Doc.

No. 110-7, at 6].

      From 2007 on, Cindy Walker spent all of her earnings as a teacher in Europe in living

expenses and did not save any money unless it was done in her client trust account.  [#41].  No

payments were made from Cindy Walker's rental account toward the 2008 note obligation until

after December 2010. Payments on the note after that date totaled $87,058.  [#175].  As of the

Walker's petition date, Rhonda Walker states that $279,706.45 was still outstanding on the 2008

Transfers.  [#176].  Cindy Walker's remaining obligation owed on the 2008 Transfers was

$299,508.08 according to the Amended Schedule B filed by the Walkers on October 18, 2013.

[#177].  Since the petition date, Cindy Walker has made monthly payments of $2,410.13.

[#179].

      Cindy Walker's tax returns for 2009 - June 2013 show net rental income from her houses

before depreciation plus interest income of $400,689.50.  [#181].[9]  Cindy Walker's Client

---

[9] Defendants contend that this is disputed although the only basis for the dispute is that the reference to the contents of Ex. 2 is not correct. The court would note that the reference in #181 should have been to Ex. 9 to Mr. Paris' affidavit. That exhibit is a chart showing the cash flow from the tax return for that period. The returns were also provided with the Trustee's supplemental affidavit. [Doc. No. 113].

Management Trust account ledger for 2009 -- June 2013 shows that she received funds of $24,555 directly, and $51,905.33 was paid on her credit cards during this period. [#182]. It also shows that $139,464 was drawn out by Rhonda and $204,664.50 was paid on Cindy Walker's recurring mortgage debt, with $7,996 paid for Cindy's income taxes. [#183]. Any capital gains from sales of Cindy Walker properties reported on her tax returns for 2009 -- mid 2013 were not sources of cash for Cindy Walker. [#184; Doc. Nos. 113-3, 113-4, Cindy Walker's Federal Tax Return Sch. D (showing total gains for the period 2009 through 2013 of less than $20,000)].

Cindy Walker's tax return for 2008 showed no interest income and net rental income before depreciation of $52,743.[10] [#185]. Cindy's tax return for 2007 shows no interest income and net rental income before depreciation of $32,696. [S#2-3].

Cindy Walker paid Don Walker $120,988.22 cash toward the purchase of 2210 Red Tail Lane from the sale of her property at 30 Woodlawn. [#50]. Cindy was present at the closing for 2210 Red Tail and signed a promissory note for $79,893.50 to Don Walker for the remaining amount owed on Red Tail Lane and the note was secured by a deed of trust on the real estate. Cindy admits she signed the note, but denies that this transfer was intended by either her or her father to create a real debt. [#51]. Cindy's house at 2210 Red Tail Lane was added to her properties that were being managed and rental from that house went into her client trust account with Don Walker Management. [#53]. Cindy admitted in her deposition that she had not made any payments on the Red Tail note, nor had her father ever asked her to, because they never intended to create a debt. [#54]. Cindy Walker first maintained in this proceeding that, in fact, no note or Deed of Trust existed on Red Tail Lane in favor of Don Walker. [#56]. In June 2016, the Trustee's attorneys located the original note in a storage file in a warehouse maintained by

---

[10] The court notes that the Trustee's supplemental statement of undisputed facts changed this amount to $54,412. [S#4]

the Walkers.  [#57].  The original note is in the possession of the Trustee and shows no evidence of being paid or cancelled.  [#58].

On October 16, 2009, Don and Rhonda paid $22,500 for a house at 1014 Grays Drive; this property was titled in the name of Cindy Walker, although the funds came from the Don and Rhonda Walker Rentals account.  [#65].  In 2010, Don Walker Construction spent at least $125,998.59 in building a new house on the property.  [#66].  Although this was agreed to, the summary prepared and provided to Don Walker at his deposition indicates that the amount spent was $98,631.33.  [Don Walker Dep., 6/13/2016, Ex. 5, Doc. No. 110-5, at 80-82].  The new house at 1014 Grays Drive sold for $148,900 on October 26, 2010, and all net proceeds of $134,329.49 were retained by Don Walker.  [#70].

In 2010, Cindy Walker purchased 714 Parkview from Julia Penlaver and James Gray under a seller-financing agreement.  [D#10].  The parties agree that $11,000 has been paid. [D#10].  They dispute whether the obligation has been satisfied.  The Trustee counters the Defendants' contention with the note which is not marked cancelled and the continued existence of the deed of trust of record.

On September 8, 2009, a house at 7736 Colemere Drive was purchased and titled into the name of Cindy Walker.  [#67].  At the time of the purchase, Cindy Walker did not have sufficient funds in her trust account to purchase the Colemere Property, and there is no record of her funds being used for this purchase.  [#69; Doc. No. 108-2, at 8].  The house at 7736 Colemere Drive sold on April 29, 2010, for $89,600 based on the HUD-1.  [#71].  At the Colemere closing, a check for $78,229.42 in net sale proceeds payable to Cindy Walker was issued by the title company, but there is no record where this check was deposited.  [#72].  The Trustee contends that the sale proceeds of $78,229.42 went to Don Walker Construction as

23

expenses as part of Cindy Walker's Schedule C Construction business that year, not to Rhonda

Walker as a 2007 house debt payment. [#167; Doc. No. 109-3, Affidavit of Spence Shumway,

Ex. B., Appx. C].  The Defendants dispute this.  [#167].  Rhonda cannot recall details about the

transaction. [#77; Rhonda Walker Dep., 6/13/2016, Doc. No. 110-6, at 59]. Cindy's 2010 tax

return does not identify a sale of the Colemere property.  [#78].  The parties dispute whether this

payment was applied to any of Cindy Walker's obligations.

In 2010, on her tax return Schedule C, Cindy Walker showed that she had a construction

business that had gross income of $226,229 and expenses of $220,890 for a net profit of $5,339.

[#73; John Ramsey Dep., 5/16/16, Ex. 11, Doc. No. 113-2, at 195].  If Cindy Walker was

involved in new house construction and sales, this would be reflected on Schedule C of her tax

returns.  [#74].  Cindy Walker has no personal knowledge of the activities of her 2010

construction business or the activities on Grays Drive during 2009 and 2010.  [#75].  She

acknowledges that her father took all of the sale proceeds from the Grays Drive house.  [#76].

No records exist of the accounting for the Cindy Walker construction business details on

Schedule C of her 2010 tax return, but the return does not reflect sales of Grays Road or

Colemere unless they are part of the construction business.  [#78].

On August 2, 2011, Rhonda Walker opened a bank account for Cindy Walker at TVA

Credit Union bearing account number (#3393).  [#88].  The initial deposit into the Cindy Walker

account (#3393) came from the closing of Rhonda Walker's account (#6749) at the TVA Credit

Union and the transfer of those funds to Cindy in the amount of $17,015.09.  [#89].  The account

records for #3393 and #6749 from the custodian of the records for TVAFCU were attached as

Exhibits 3 and 4 to the Affidavit of Jim Paris.  [Doc. No. 108].  In the next few months of 2011,

Rhonda Walker deposited an additional $35,000 into the new Cindy Walker TVA Credit Union

account so that on December 15, 2011, a balance of $57,050.70 existed. [#90]. Cindy Walker knew nothing about her TVA Credit Union account or its use in connection with the purchase of 1609 Bush Road. [#91]. Cindy Walker also maintained an account at First Tennessee Bank with her mother during 2011, with an account number ending in #8330 that was used for Cindy's purposes, including a debit card. [#92]. From August to October 25, 2011, Cindy Walker maintained a balance of $5.80 in the First Tennessee (#8330) account. [#93; Doc. No. 108-6, Affidavit of Jim Paris, Ex. 5, Affidavit of Custodian of the Records, p. 2-10]. On November 17, 2011, Rhonda Walker transferred $50,000 in funds from her joint account with Don Walker at First Tennessee Bank account #1836 into Cindy's First Tennessee account #8330. [#94]. On November 16, 2011, Don Walker transferred $7,000 of funds from third parties (Girton) into Cindy's account number (#8330). [#95; Doc. No. 108-6, at 13]. As of November 25, 2011, Cindy Walker's First Tennessee account (#8330) contained funds of $57,006.49. [#96; Doc. No. 108-6, at 10]. The parties dispute whether these funds came from Cindy. The Defendants rely on Rhonda's statement that she was handling Cindy's funds for her and that she cannot prove that they did not come from her. [#97].

On December 15, 2011, Don Walker, using Cindy's power of attorney, purchased a foreclosure house at 1609 Bush Road in Chattanooga and titled it in Cindy's name. [#98; D#13]. The purchase price for 1609 Bush Road was $114,128.24. [#99]. To facilitate the purchase, on December 15, 2011, Rhonda or Don Walker obtained cashier's checks in the amount of $53,128.24 from Cindy's TVA account (#3393) and $56,000 from Cindy Walker's First Tennessee account (#8330) with $5,000 more coming from earnest money. [#100]. Cindy Walker had no knowledge of the $50,000 her parents put into her First Tennessee account (#8330) during the latter part of 2011. [#101]. Cindy disputes the Trustee's contention that she

25

"has no idea if she repaid her parents for their purchase of the Bush Road house for her. [#102].

Cindy denies that her dad advanced her $109,000 in cash paid at closing. [#102]. She knew

nothing of the $50,000 transfer to her by her parents on November 17, 2011, until a week before

her July 2016 deposition. [#103]. She did not know of the existence of the TVA Credit Union

account (#8330) in her name until shortly before her deposition on June 10, 2016. [#104].

Rhonda does not know why she opened the TVA Credit Union account (#8330) in Cindy's name

or why she put over $50,000 of her funds into it in 2011. [#105]. Cindy admits that she owes

her mother $50,000 related to the purchase. [D#14; Cindy Walker Dep., 7/21/2016, Doc. No.

110-4, at 30].

The Defendants rely on Rhonda's deposition as their evidence that these funds were not

advanced to Cindy by her father. [Rhonda Walker Dep., 6/13/2016, Doc. No. 110-6]. In the

deposition, following the Trustee's questioning of the transactions leading up to the purchase,

Ronda explains:

> I never – I didn't remember any of this until you showed it to me now. It would
> never have occurred to me in June of 2013. And I still – I can look at this and see
> that I've written these checks. But I would have to say that a lot of this money, if
> not all of it, could've been Cindy's. I kept Cindy's money. I saved it for her, a
> lot of it in my own accounts. Therefore, even though it came from me, I would
> very much have considered it Cindy's money.

[Rhonda Walker Dep., 6/13/2016, Doc. No. 110-6, at 20].

Rental income from the Bush Road Property has been deposited into Cindy's client trust

account. [#106]. The current value of the Bush Road property is estimated by Don Walker to be

"conservatively" $165,000. [#108, Don Walker Dep., 6/13/2016, Doc. 110-5, at 40]. The court

finds that there is no genuine issue of fact as to the value of the Bush Road house, given that the

only evidence to create a dispute is the characterization of the value as a conservative figure,

which is to the Defendants' benefit in determining the amount owed for a fraudulent transfer.

26

A house on 4044 Homer Street in Chattanooga was purchased from Michael Smiley on

March 27, 2012, for $27,000 and titled in the name of Cindy Michelle Walker.  [#109, D#15].

To make the purchase, a check for $7,675.60 was made as a down payment out of the Walker

Client Management Trust account.  [#110].  These funds were not charged to Cindy Walker's

trust account.  [#111].  Cindy Walker signed her name to a $20,000 note to the seller (Smiley)

and payments were made monthly out of Cindy's client trust account funds until the house was

paid off.  [#112].  The Trustee disputes that these funds are Cindy's if the court finds that the

transfers that may account for a significant portion of her income are rightfully the property of

the Walkers.

On July 9, 2012, Don and Rhonda Walker conveyed their property at 142 Bentley Woods

to Cindy Walker.  [#113].  Don Walker has estimated its value at $135,000 to $145,000.  [#114].

The Walkers transferred 142 Bentley Woods to Cindy in a like-kind exchange for the sale funds

of Cindy's property at 6006 Parson Pond Drive. [#115]. Funds were generated because Cindy

Walker sold a house at 6006 Parsons Pond Drive for $117,350 to a third party on May 31, 2012.

[#116].  The net proceeds of sale of 6006 Parsons Pond Drive were $111,451.20, and these were

sent by the title company to Athens Federal Savings & Loan to obtain a release of its lien against

142 Brently Woods on July 9, 2012.  [#117].

Before the purchase of the Parsons Pond property, a house at 7511 John Henry was

bought on October 20, 2009, and titled in Cindy Walker's name.  [#118]. The purchase price was

$40,000, but these funds did not come out of Cindy Walker's trust account.  [#119].  The

Defendants object to this fact as unsupported, but Cindy Walker's Trust account records do not

show any credit during the two month period following the sale.  [Doc. No. 108-2, Affidavit of

Jim Paris, Ex. 1, Trust Account Detail, at 9-10]. These same records show that her account was

charged for approximately $30,000 in repairs for 7511 John Henry after the purchase in late 2009. [#120]. Cindy Walker sold 7511 John Henry to Kathleen Johnston on November 19, 2009. [#121]. Cindy financed the sale and took back an $86,150 seller's mortgage. [#122]. Ms. Johnston paid out the balance on the note of $82,824 in April 2012, and this was deposited into Cindy's Client Management Trust account. [#123]. The property at 6006 Parsons Pond was immediately purchased in Cindy Walker's name for $86,023 on April 11, 2012, with funds in her Client Management Trust account. [#124].

In 2013, Cindy's Walker's trust accounting for her properties was subdivided into two trust accounts, "CW TIST" and "CW Properties" within Don Walker Client Management. [#125]. During 2013, Brent Walker, son of Don and Rhonda, maintained a savings account at First Tennessee Bank, account no. (#1832). [#128]. On March 1, 2013, Rhonda Walker transferred $20,000 to Brent from her account #1836, and this was deposited into his savings account #1832. [#130]. On March 14, 2013, Rhonda Walker deposited two checks payable to her from Cindy Walker's trust account in the amount of $1,300 and $650 into Brent's savings account (#1832). [#131]. On the same day Rhonda Walker deposited $9,000 payable to her from Don and Rhonda's rental account (#1490) into Brent's savings account (#1832). [#132]. None of the three transfers on March 14, 2013, were listed on the Walker's petition or amended schedules. [#133; *See In re Don and Rhonda Walker*, Case No 1:13-bk-13184-SDR, Doc. Nos. 1, 20, 25, 192, 195].

On March 29, 2013, funds in the amount of $30,000 were transferred from Brent's savings account (#1832) to a third party named Parshall. [#135]. Rhonda Walker sold a rental property of hers on 1119 North Concord Road to the Parshalls for approximately $156,000 on April 25, 2013. [#136]. The Parshalls brought the $30,000 from Brent's account with them at

28

closing on April 25, 2013, and used it for the down payment on 1117 N. Concord.  [#137].

Rhonda Walker netted $24,242.46 at closing of 1117 N. Concord Rd., and deposited her check

into the client trust account for the credit of Cindy Walker on May 3, 2013.  [#138].

An analysis of Cindy Walker's client trust accounts after the purchases shows that a total

of $18,056 was spent on repairs of 9004 Fuller Road and 6861 Standifer Gap to June 30, 2013;

Cindy had a negative balance at all times in her account and these repairs were made from other

people's money.  [#126; Doc. No. 108-2, Affidavit of Jim Paris, Ex. 1, Trust Account Detail, at

53-58].  On April 25, 2013, when Cindy Walker's combined client trust account balance was

minus $18,008.19, Rhonda Walker deposited $5,000 into this account for Cindy's credit; this

transfer was not listed on the petition or amended schedules.  [#127].  The account records reflect

a deposit of $5,000 on April 26, 2013, referenced as "Owner's Capital."  [Doc. No. 108-2, at 71].

There is no check or deposit slip showing the source.

The Concord closing deposit from Rhonda brought Cindy's Trust account balance from

negative up to a positive balance of $16,170.77.  [#140].  The $30,000 transfer was not listed in

the Petition and Schedules. [#141]  The Parshalls did not repay the $30,000 to the Walkers prior

to the petition date.  [#142; *See In re Don and Rhonda Walker*, Case No 1:13-bk-13184-SDR,

Doc. No. 762].

On May 17, 2013, funds from the Don Walker Construction account of $27,000 were

deposited into the client trust account for credit to Cindy Walker.  [#143].  On May 17, 2013, the

Walkers deposited two $5,000 checks into the client trust account for the benefit of Cindy

Walker; they also deposited $8,000 for her benefit in the form of cash.  [#144; Doc. No. 108-2,

Affidavit of Jim Paris, Ex. 1, Trust Account Detail, at 72].  On or about May 17, 2013, a check

for $78,000 from Don Walker Construction was deposited into the client trust account as well as

$9,000 in cash in the same deposit. [#145]. None of the transfers to Cindy Walker that occurred on May 17, 2013, were listed on the petition by the Walkers or on the amended schedules. [#146; *See In re Don and Rhonda Walker*, Case No 1:13-bk-13184-SDR, Doc. Nos. 1, 20, 25, 192, 195]. On or about May 17, 2013, two checks in the amounts of $81,722.22 and $69,242.81 were written out of the Client Management account to First Tennessee Bank to purchase cashier's checks to close the purchases of 9004 Fuller Road and 6861 Standifer Gap Road. [#147; Doc. No. 108-2, Affidavit of Jim Paris, Ex. 1, Trust Account Detail, at 72]. The two properties were titled in the name of Cindy Walker on May 17, 2013. [#148]. Cindy was in Europe at the time and was told of the purchases by her mother and Cindy was happy about that. [#149].

The Debtors originally alleged that the proceeds from the sale of the note executed by King Phillips were used to buy the houses. The proof is unclear whether the King Phillips note was proceeds of a sale of one of the transferred properties. There appears to be no dispute that the note was sold on or about April 21, 2013, to Baptist International Missions for $45,000. [Doc. No. 109-3, p. 164]. The proceeds were deposited in Brent Walker's savings account. The Defendants dispute the conclusion the Trustee draws for the existence of the proceeds in the account of Brent Walker. [#150]. Rhonda Walker testified that Cindy was owed these proceeds and that they were mistakenly placed in her brother's account. Rhonda had thought the proceeds were mistakenly deposited in one of her accounts so she advanced the same amount to Cindy's account. Because the advance was a mistake, it created a debt owed by Cindy back to her parents. [Rhonda Walker Dep., 6/13/2016, Doc. No. 110-6, at 82]. The parties also dispute whether Cindy Walker's aunt contributed to the purchase of these two houses. [#151].

When later asked about the King Phillips note and sale, Cindy Walker stated that she had never heard of him and did not know about any sale of a note.  [#152].  On June 5, 2013, Don Walker was written a check out of Cindy Walker's Client Management account in the amount of $27,000, leaving her account at negative $71,979.75.  [#153].  Rhonda Walker had a check written to her for $24,242.46 (#36302) on June 6, 2013 out of Cindy Walker's Client Management account; however, there were no funds to cover this check, and Cindy's account balance went to negative $89,837.21.  [#154].  The checks written to the Walkers on June 5 and June 6, 2013, came from other clients' funds in the Client Management Trust account, and those funds "floated" Cindy for some months until she was able to catch up.  [#155].  Cindy Walker knows no details about the funding for the purchases of 9004 Fuller Road and 6861 Standifer Gap Road in May 2013, but she admits she repaid nothing to the Walkers prior to the petition date for these two houses.  [#156].

Don and Rhonda Walker filed their petition for bankruptcy on June 28, 2013.  [D#22]. The Trustee filed the complaint in the first adversary proceeding, 1:14-ap-1051-SDR on July 10, 2014.  [D#19].  This adversary complaint, the second complaint, was filed on June 17, 2015. The complaint was amended on October 27, 2015.  [D#20]. The parties do not dispute the dates of the transfers provided above.

The court held that Don and Rhonda were insolvent as of May 2013.  [D#23]  The specific timing of their entry into the zone of insolvency is in dispute.  [D#27-30].  The Trustee's affidavit provides an accounting based on the Debtors' statements in their petition.  He also provides an estimate of the likelihood that Rhonda Walker will be liable for the FirstBank debt. The Defendants respond that the Trustee has failed to tie his proof on assets and liabilities to the dates of specific transfers, leaving some question in the court's mind as to the Walker's financial

condition at the time of each transfer.  A determination of the financial status of the transferor at

the time of each transfer except for 9004 Fuller Road and 6861 Standifer Gap will need to be

made if the court finds that there was no intent to defraud the creditors when the transfers were

made.  The parties also dispute how many of the houses obtained by Cindy Walker should be the

subject of consolidation.  [D#40-42].  The parties dispute the regularity of the payments from

Cindy' Client Management account.  [D#2].  The Trustee alleged in his amended complaint that

the Walkers kept the net rental from each property as their own, not as repayments from Cindy

on her houses.  [Doc. No. 31, at ¶ 11].

## V.      Analysis

As a result of the undisputed facts outlined above, the Trustee argues that he is entitled to

summary judgment based on three theories of recovery: (A) substantive consolidation; (B)

avoidance of fraudulent transfers; and (C) payment of debt.  The Trustee also seeks summary

judgment as to: (D) the note signed for 2210 Red Tail Lane as being valid, due and owing, and

enforceable at a balance, as of August 31, 2016, of $286,682.  The court will address the

Defendants' arguments for summary judgment as they pertain to each theory of recovery.

Finally, the court will address: (E) the Defendants' motion for summary judgment on the

Trustee's claim for a resulting trust.

### A.      *Substantive Consolidation*

The first question before the court is whether the Trustee is entitled to substantive

consolidation of the fifteen real properties[11] held by Cindy Walker and/or her trust with the

---

[11] The Trustee seeks substantive consolidation of all of the houses involved in the suit except 2210 Red Tail Lane.
[Doc. No. 107-2, at 2].

Debtors' bankruptcy estates as a matter of law.  The Defendants contend that the court does not possess such authority and that there is no set of facts which can support such an exercise of this court's jurisdiction. [Doc. No. 115, at 4-6, 11-12].  If the court has such authority, then the court must decide whether there are issues of fact as to whether that remedy should be employed.

1.    *The Legal Basis for the Court's Authority to Substantively Consolidate*

Substantive consolidation is a "judicially created doctrine that treats separate legal entities as if they were merged into a single entity, pooling the assets and liabilities of the two entities, so that the assets of the two entities may result in a common fund available to satisfy the debts of both entities. Fundamentally, it is a judicial doctrine that has been applied by courts to ensure the equitable treatment of all creditors."  *Simon v. ASIMCO Techs., Inc. (In re American Camshaft Specialties, Inc.)*, 410 B.R. 765, 778 (Bankr. E.D. Mich. 2009); *see also Huntington Nat'l Bank v. Richardson (In re Cyberco Holdings, Inc.)*, 734 F.3d 432, 438 (6th Cir. 2013).  The Sixth Circuit has recognized, "[s]ubstantive consolidation is not a procedure or right recognized by the Bankruptcy Code or Rules . . . although the prevailing view is that it 'has been considered part of the bankruptcy court's general equitable powers since the passage of the Bankruptcy Act of 1898.'"  *In re Cyberco Holdings, Inc.*, 734 F.3d at 438-39 (quoting *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 763 (9th Cir. 2000)). The court concludes that it has the equitable power to use the remedy of substantive consolidation, but without the Sixth Circuit having adopted a specific test, it must select a test for determining whether the remedy is appropriate for the case and how the elements of the test will be demonstrated.

2.    *The Circuit Tests for Substantive Consolidation*

In selecting the appropriate test, the court finds instructive Judge Shefferly's analysis in *In re American Camshaft Specialties, Inc.*  To determine whether four non-debtor corporations

should be consolidated with the corporate debtors, the *American Camshaft* court reviewed the

history of the doctrine in bankruptcy and insolvency cases beginning with its origin in *Sampsell*

*v. Imperial Paper & Color Corp.*, 313 U.S. 215, 61 S. Ct. 904, 85 L. Ed. 1293 (1941).  *See In re*

*American Camshaft Specialties, Inc.*, 410 B.R. at 778-79.  In *Sampsell*, the debtor was an

individual who had used a corporation as a "sham and a cloak" to prevent his creditors from

reaching his assets while preserving those assets for himself and his family.  *Sampsell*, 313 U.S.

at 217.  Following an order providing that the corporation's assets would be administered for the

benefit of the debtor's creditors, a creditor of the consolidated corporation sought to be paid prior

to the individual's creditors. The trial court found that the creditor had "full knowledge of [the

corporation's] fraudulent character" and disallowed the priority of the creditor's claim. *Id.*  The

Court first addressed whether the corporation was a "substantial adverse claimant" to the

dominant stockholder.  *Id.* at 218.  The Supreme Court found that, where the corporation's

"affairs are so closely assimilated to the affairs of the dominant stockholder that in substance it is

little more than his corporate pocket," the corporation is not an adverse claimant.  *Id.*  The

Supreme Court also found that a "family corporation's adverse claim is merely colorable where,

as in this case, the corporation is formed in order to continue the bankrupt's business, where the

bankrupt remains in control, and where the effect of the transfer is to hinder, delay or defraud his

creditors."  *Id.*

　　　　The Supreme Court found that where there were fraudulent transfers to the corporation

targeted to be consolidated, the creditor of that corporation had the burden of coming forward to

show by "clear and convincing evidence that [consolidation's] application to his case, so as to

deny him priority, would work an injustice."  *Id.* at 219.  The Court noted that the burden had

been sustained in the past by creditors of a targeted corporation "and their paramount equity

ha[d] been established where there was no fraud in the transfer, where the transferor remained solvent, and where the creditors had extended credit to the [targeted corporation]." *Id.* at 219-20. The Supreme Court concluded that due to the creditor's knowledge of the fraudulent transfers, it could not carry its burden and consolidation was allowed while its priority in the assets of the target corporation was denied. *Id.* at 221.

The *American Camshaft* court then compared two of the leading cases decided after the enactment of the Bankruptcy Code to highlight the different approaches courts have used to determine whether the equities of a case require substantive consolidation. The first is *In re Auto-Train Corp.*, 810 F.2d 270 (D.C. Cir. 1987). The second is *Union Savings Bank v. Augie Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515 (2d Cir. 1988).

In *Auto-Train*, the issue of whether to consolidate was not directly before the court. The Chapter 11 trustee's request to consolidate a wholly-owned subsidiary non-debtor corporation with the debtor parent corporation had been granted. The opposition to consolidation arose as a defense to the trustee's attempt to recover preferential payments from the subsidiary's creditors. The specific issue before the court was whether the date of filing for the subsidiary was the date of the parent's filing or the date of the consolidation. *In re Auto-Train*, 810 F.2d at 277. In dicta, the court expressed that "[t]he proponent must show not only a substantial identity between the entities to be consolidated, but also that consolidation is necessary to avoid some harm or to realize some benefit." *Id.* at 276. The court explained that once a trustee makes this prima facie case for substantive consolidation, the creditor must come forward and demonstrate that "it relied on the separate credit of one of the entities and that it will be prejudiced by the consolidation." *Id.* Before ordering consolidation, a court must then determine "that the demonstrated benefits of consolidation 'heavily' outweigh the harm." *Id.*

The *Auto-Train* approach was adopted by the Eleventh Circuit in the case of *In re Eastgroup Properties v. Southern Motel Association,* 935 F.2d 245 (11th Cir. 1991).[12]  That case involved a request by a Chapter 7 trustee for the consolidation of two debtor entities; one held the title and leasehold interests of the property and the other operated the motel business located on the property. The trustee presented evidence of their substantial identity based on factors identified in the case of *In re Vecco Industries, Inc.*, 4 B.R. 407 (Bankr. E.D. Va. 1980)[13]; however, the court noted that while such factors were helpful, "[n]o single factor [was] likely to be determinative in the court's inquiry." *Eastgroup*, 935 F.2d at 249.  The court articulated its test as one which requires the proponent to show: (1) "substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit." *Id.* at 249.  Upon such a showing, a presumption arises "that creditors have not relied solely on the credit of one of the entities involved." *Id.* (citation omitted).  Once the prima facie showing of substantial identity and harm or benefit is made, the burden shifts to an objecting creditor to show that it has relied on the separate credit of one of the entities to be consolidated and that it will be prejudiced by substantive consolidation. *Id.*

The Eleventh Circuit employed the test again in *Reider v. Federal Deposit Insurance Corporation, (In re Reider)*, 31 F.3d 1102 (11th Cir. 1994).  In *Reider*, a creditor of one debtor spouse sought to have the other debtor spouse's estate consolidated.  The Eleventh Circuit

---

[12] The *American Camshaft* opinion did not discuss the test developed by the Eleventh Circuit, but the court finds the Eleventh Circuit's development of a test helpful in its selection of a test.

[13]  Those factors include:
   (1) The presence or absence of consolidated financial statements.
   (2) The unity of interests and ownership between various corporate entities.
   (3) The existence of parent and intercorporate guarantees on loans.
   (4) The degree of difficulty in segregating and ascertaining individual assets and liabilities.
   (5) The existence of transfers of assets without formal observance of corporate formalities.
   (6) The commingling of assets and business functions.
   (7) The profitability of consolidation at a single physical location.
*Eastgroup*, 935 F.2d at 249 (citing *In re Vecco Indus., Inc.*, 4 B.R. at 410).

considered the additional factor of joint administration on the *Eastgroup* test.  The Eleventh

Circuit repeated its commitment to the *Eastgroup* test with a modification for certain

considerations in the spousal context.  *Id.* at 1108.  The court set out factors for determining

substantial identity, including "the extent of jointly held property and the amount of joint-owed

debts."  *Id.* at 1108-09.  After determining the existence of substantial identity, a court must then

analyze "the harm attendant to a failure to consolidate," including consideration of whether

"administrative difficulties in disentangling the spouse's estates makes it prohibitively expensive

or where disentanglement is otherwise impracticable."  *Id.* at 1109.  The *Reider* court explained

that:

> A creditor may also demonstrate that it will be unfairly prejudiced by a failure to
> consolidate and may interpose the fraud or bad faith of the debtors as a defense.
> To prevent consolidation, a creditor may demonstrate that it has relied on the
> separate credit and assets of one of the spouses and would be harmed by a
> consolidation of assets.  The burden is upon the proponent of a motion for
> consolidation and is exacting.[14]  Ultimately, the court must be persuaded that "the
> creditors will suffer greater prejudice in the absence of consolidation than the
> debtors (and any objecting creditors) will suffer from its imposition."

*Id.* (quoting *In the Matter of Steury*, 94 B.R. 553, 554-55 (Bankr. N.D. Ind. 1988) (other citations

omitted)).

In reaching its decision, the *Reider* court reviewed a line of substantive consolidation

cases in which the debtor corporation had used its affiliates as its instrumentalities.  *Id.* at 1106.

---

[14] The *Reider* court's reference to the burden appears inconsistent with the holding in *Eastgroup* and its comment
earlier in the opinion of the need for the creditor to demonstrate harm. The citation to *In re Knobel*, 167 B.R. 436,
n.10 (Bankr. W.D. Tex. 1994) at this point in the opinion does not directly address the ultimate burden of proof
regarding harm to the target or its creditors.  In note 10, the court discusses three cases involving jointly
administered estates in which consolidation was requested.  All discuss the difference between joint administration
and consolidation, but not the issue of who had the burden of proof regarding harm to the target's creditors.  In each
case, the opposing party put on proof of the harm. *Chan v. Austin Bank of Chicago, (In re Chan)*, 113 B.R. 427
(N.D. Ill. 1990) (debtors moved for consolidation over objection of creditor; court found the existence of jointly held
property and commingling of assets and determined that creditor's showing that its recovery would be reduced from
100% to 36% was not sufficient harm for district court to find an abuse of discretion); *In re Birch*, 72 B.R. 103
(Bankr. D. N.H. 1987) (consolidation denied when opposed by wife based on prejudice to wife's creditors and no
evidence of intermingling of assets from husband's proprietorship); and *In re Scholz*, 57 B.R. 259 (Bankr. N.D. Ohio
1986) (IRS sought consolidation of claims of husband and wife's estates; consolidation was denied based on
prejudice to other creditors and IRS's negligence in filing its claim late.).

It began with *Soviero v. Franklin National Bank of Long Island*, 328 F.2d 446 (2nd Cir. 1964).

*Id.* The court noted that the *Soviero* court had relied on the injustice to creditors that would

result if the separate entities were recognized. *Id.* (citing *Soviero*, 328 F.2d at 448.) The *Reider*

court also found support in *Soviero* that "creditors who knew of the close association between

the bankrupt and affiliate may be estopped to assert any prejudice caused by consolidation." *Id.*

(citing *Soviero*, 328 F.2d at 488-89 (citing *Stone v. Eacho*, 127 F.2d 284, 288 (4th Cir. 1942))).

The next case the *Reider* court reviewed was *Chemical Bank New York Trust Co. v.

Kheel*, 369 F.2d 845 (2d Cir. 1966). There, "[i]n addition to ignoring corporate formalities, the

debtors had commingled funds and conducted intercorporate loan transactions which they had

failed to record sufficiently on the separate books of the various debtors." *Id.* (citing *Kheel*, 369

F.2d at 846). In determining to consolidate the seven corporate debtors controlled by one man,

the *Kheel* court found that consolidation was mandated "where the interrelationships of the group

are hopelessly obscured and expense necessary even to attempt to unscramble them so

substantial as to threaten the realization of any net assets for all the creditors." *Kheel*, 369 F.2d at

847. The *Reider* court viewed *Kheel* as adding a critical factor not present in *Soviero*, "'the

expense and difficulty amounting to a practical impossibility of reconstructing the financial

records of the debtors to determine inter-corporate claims, liabilities and ownership of assets.'"

*Reider*, 31 F.3d at 1106 (quoting *Kheel*, 369 F. 2d at 847).

The Eleventh Circuit explained that "two central themes emerge" from *Soviero* and

*Kheel*. *Id.* "[D]isregard of corporate formalities and commingling of assets may indicate

substantive consolidation is appropriate." *Id.* These could be found from a court's recognition

that "substantial identity" exists between the debtors. *Id.* The court explained that substantial

identity could be found where one entity exercises "ultimate control over the assets and the other

entities operate as mere instrumentalities." *Id.* The court concluded its discussion with two other cases in which the second prong of the test, the relative harm to creditors, was discussed, *In re Flora Mir Candy Corp.*, 432 F.2d 1060 (2d Cir 1970) (Consolidation of a parent and twelve subsidiaries denied where harm to one set of creditors sufficiently outweighed the possible benefits of consolidation to other creditors.) and *In re Continental Vending Machine Corp.*, 517 F.2d 997 (2d Cir. 1975) (Consolidation allowed with respect to unsecured claims but not secured claim in a plan of reorganization. Creditors had to make a strong showing that harm would occur absent consolidation.). *Id.* at 1107.

The other line of cases originates from *In re Augie/Restivo Baking Co.*, 860 F.2d 515 (2d Cir. 1988), which involved the consolidation of two debtor entities requested by the debtor entities themselves. Consolidation was denied by the Second Circuit based on its conclusion that the facts did not justify consolidation. It held that the two critical factors were: (1) "whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit;" or (2) "whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." *Id.* at 518 (citations omitted).

In 2005, the Third Circuit joined the courts of appeal to have articulated tests. *In re Owens Corning*, 419 F.3d 195 (3rd Cir. 2005). There a debtor parent corporation sought a "deemed" consolidation with its affiliates for purposes of their plan. *Id.* at 199. The remedy was opposed by a bank consortium which argued that consolidation would effectively eliminate the guaranty for which they had bargained. *Id.* The Third Circuit overturned the consolidation on the basis that "the proponents of substantive consolidation request[ed] it not to rectify the seldom-seen situations that call for this last-resort remedy but rather as a ploy to deprive one group of creditors of their rights while providing a windfall to other creditors." *Id.* at 199-200.

39

The Third Circuit favored the *Augie/Restivo* analysis because if felt that the balancing test of *Auto-Train* created too low a threshold. *Id.* at 210. ("To us this fails to capture completely the few times substantive consolidation may be considered and then, when it does hit one chord, it allows a threshold not sufficiently egregious and too imprecise for easy measure.").

The *Owens Corning* court rejected a "checklist" approach because it "often results in a rote following of a form containing factors where courts tally up and spit out a score without an eye on the principles that give the rationale for substantive consolidation (and why, as a result, it should so seldom be in play)." *Id.* The court instead focused on the policies for not imposing substantive consolidation: (1) "[l]imiting the cross-creep of liability by respecting entity separateness," which upholds the expectations of state law, the Bankruptcy Code, and the commercial markets; (2) the availability of other more precise remedies such as fraudulent transfers and equitable subordination; (3) "[m]ere benefit to the administration of the case (for example, allowing a court to simplify a case by avoiding other issues. . . )" not being sufficient for consolidation; (4) the policy of sparingly using such a remedy because it may have a profound effect on creditors of the target; and (5) the potential for misuse as an offensive weapon to disadvantage a creditor. *Id.* at 211. The *Owens Corning* court concluded by adopting a variation of the *Augie/Restivo* case:

> In our Court what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

*Id.*

The court in *In re American Camshaft Specialties, Inc.*, 410 B.R. 765, 787 (Bankr. E.D. Mich. 2009), adopted a slightly modified *Owens Corning* test in its analysis of whether a

40

nondebtor could be consolidated.  It articulated the same policy concerns that the Third Circuit

had raised and also discussed an additional due process concern regarding the remedy's impact

on creditors who continue to transact business with a nondebtor entity where such creditors are

not parties to any action brought to substantively consolidate the non-debtor with the debtor.  *Id.*

at 786.  Nevertheless, the court concluded that it did have authority to consolidate the non-debtor

with the debtor.

> There is sufficient settled authority for a bankruptcy court to impose the equitable
> remedy of substantive consolidation, even on a non-debtor, in a rare case.  But it
> is an extraordinary remedy to be utilized *only where there are no other adequate
> remedies*, particularly where the entity sought to be consolidated is not itself
> already a debtor in a bankruptcy case.  Until the Supreme Court or the Sixth
> Circuit Court of Appeals enunciates a standard to determine when the elements of
> substantive consolidation are present, this Court will only substantively
> consolidate a non-debtor entity with a debtor where it is shown that either: (i) the
> debtor and the non-debtor entity in their pre-petition conduct disregarded the
> separateness of their respective entities so significantly as to lead their creditors to
> treat them as one legal entity; or (ii) that post-petition, the assets and liabilities of
> the debtor and the non-debtor entity sought to be consolidated are so hopelessly
> scrambled and commingled that it is impossible to separate them and tell them
> apart thereby resulting in harm to all creditors.  The identification of these two
> alternative circumstances warranting substantive consolidation, one pre-petition
> and one post-petition, is not, in this Court's view, inconsistent with the
> circumstances that the Sixth Circuit identified in dicta as warranting substantive
> consolidation.  In fact, in *Baker & Getty,* the Sixth Circuit noted that in that case,
> there was evidence both that the creditors of the two entities treated them as one
> entity and that the two entities were "hopelessly intertwined."  *Baker & Getty,*
> 974 F.2d at 720.  In sum, the Court adopts the *Owens Corning* analysis.

*Id.* at 787 (emphasis added).  Having held that it had the authority, the court ultimately held that

the trustee had not stated a cause of action for substantive consolidation.  *Id.* at 791-92.

This analysis was not criticized, although expressly not adopted, in the Sixth Circuit's

most recent consideration of substantive consolidation, *Spradlin v. Beads and Steeds Inns, LLC,*

*(In re Howland)*, No. 16-5499, --F. App'x--, 2017 WL 24750 (6th Cir. Jan. 3, 2017).  The Sixth

Circuit cautioned that "[s]ubstantive consolidation is an 'extreme' measure, only to be used

'sparingly,' especially when consolidating a non-debtor entity." *Id.* at *5 (quoting *In re Owens*

*Corning*, 419 F.3d at 208-09, 211 and *In re American Camshaft Specialties, Inc.*, 410 B.R. at 787). *In re Howland* involved a Chapter 7 trustee's efforts to avoid a fraudulent transfer made by a closely held limited liability company using what the court called a "reverse" piercing of the corporate veil. The defendant had moved for judgment on the pleadings, which the bankruptcy court granted. *In re Howland*, 518 B.R. 408 (Bankr. E.D. Ky. 2014). The trustee moved to amend his complaint, which the bankruptcy court denied as futile on the basis that the complaint "failed to adequately plead a claim for substantive consolidation." *In re Howland*, 2017 WL 24750, at *2. In analyzing what a trustee must allege to state a claim for substantive consolidation, the Sixth Circuit recited the *Owens Corning* test, virtually the same test adopted by the court in *In re American Camshaft Specialties Inc.*, but in a footnote commented that it was not adopting the *Owens Corning* test, but merely using those factors because the parties had agreed to that test. *Id.* at *5 n.3. The Sixth Circuit again noted that it "has not adopted a test for evaluating a substantive consolidation claim." *Id.* (quoting *In re Cyberco Holdings, Inc.*, 734 F. 3d at 439 ("Our cases have not discussed the concept at length or prescribed factors to consider when it is to be applied, but we have recognized the procedure without criticism.")).

Having reviewed the various tests, and noting that the Sixth Circuit has not adopted a test, the court finds that it favors and will adopt the *Auto- Train/Eastgroup* approach.

The proponent is required to show that there is substantial identity between the debtor and the target. This can be shown through disregard of corporate separateness, joint ownership, or the circumstance where one entity exercises ultimate control over the assets and the other entity operates as a mere instrumentality of the debtor. The proponent must also demonstrate that the debtor's creditors will suffer greater prejudice in the absence of consolidation than the

target and its creditors will suffer from its imposition. The balancing of relative prejudice must heavily favor the debtor's creditors.

This test also requires the target (or the target's creditors) to come forward to show the harm that will result from substantive consolidation. That evidentiary burden is shifted to the party with the most knowledge of the potential for harm. It also acknowledges that creditors of the debtor may interpose the target's complicity or knowledge of any fraud as a defense against the target's claim of harm. The court also finds this test may be more useful in a case with missing records and undocumented transfers such that a trustee may have difficulty proving the extent of the scrambling of the assets and liabilities, especially if that information is controlled by the debtor through its control of the target.

The court takes to heart the concerns noted by the court in *American Camshaft*. Entity separateness, the availability of more precise remedies, and the profound impact that consolidation may have on the debtor and the target and its creditors are important considerations when weighing the prejudice. The court also takes heed of the Sixth Circuit's mandate that the remedy should be sparingly applied. However, when used as a last resort, or even as *American Camshaft* recognizes when there are "no other adequate remedies available," the *Auto-Train/Eastgroup* tests provide the court with more flexibility in those cases where such an exceptional remedy may be warranted.

### 3.    Application of Test

Having selected the *Auto-Train/Eastgroup* test, the court must now consider whether there remain genuine issues of fact with respect to whether other adequate remedies exist. If not, the court must determine whether there remain genuine issues of fact as to the substantial identity of the Defendants and the Debtors and as to whether the Debtors' creditors will suffer

43

greater prejudice in the absence of consolidation than the Defendants (and any objecting creditors) will suffer from its imposition.

The Trustee has alleged multiple other theories of recovery including fraudulent transfer, debt enforcement, and resulting trust.  These theories could provide him with complete relief. The court finds that summary judgment on the issue of substantive consolidation is not appropriate separate and apart from the court's consideration of these other issues.  Where a more precise remedy is available, the court will not start with the exceptional remedy of substantive consolidation.  If the court determines at trial that substantive consolidation is the only available remedy given all of the facts and circumstances, the court may impose it if the other elements are met.

With respect to substantial identity, factual issues remain.  The Trustee has provided evidence that Cindy Walker's rental house business was entirely controlled by the Debtors. They selected the properties she would put in her name, and they managed and maintained them. They had control of how her rental income was spent, whether it was used to hire her father's construction firm to provide services, whether it was used to provide a source of income for her mother's withdrawals from the Client Management account, or to fund the shortfall in other clients' accounts.  They even used Cindy's account to purchase properties from themselves or, in Rhonda's case, her trust.

Cindy offers the obvious fact that she is an individual and not a subsidiary.  She argues that she cannot be considered to have substantial identity with her parents.  She also contends that she intended to pay her parents for the houses.  If the court finds that there is a debtor/creditor relationship then that would be a significant factor in considering whether there is

in fact substantial identity.  Because the court must determine whether the parties intended for this to be a credit relationship, the court finds that genuine issue of fact remain on this issue.

Finally, the Trustee contends that he is minimizing the harm that could be caused by the imposition of substantive consolidation by proposing that the consolidation would not affect her creditors who have security interests in any of the properties recovered by the Trustee.  Further, he has shown that Cindy will retain other houses that her parents provided to her before 2007 or houses that she has shown were financed with bank loans that have been satisfied by the rents generated from those houses.  Cindy contends that these houses are her future and that her loss of them will be devastating to her future security in retirement.  The court finds that there are issues of fact remaining related to the relative harms caused by consolidation.  Therefore, as to substantive consolidation, the court finds that neither party is entitled to a summary judgment.

## B.    *Avoidance of Fraudulent Transfers*

The Trustee next moves for summary judgment based on his theory that fifteen of the transfers between Rhonda Walker and Cindy Walker and/or her trust were fraudulent and should be avoided. [Doc. No. 107-2, at 34].  The Defendants first move that certain counts be dismissed as barred by the applicable statute of limitations. [Doc. No. 111-1, at 6].  The Defendants also assert that the Trustee has failed to establish either Debtor's insolvency on the date of the alleged transfers.  *Id.* at 11.

### 1.    *Selection and Application of the Relevant Statute of Limitations*

#### a. Undisputed Facts

For purposes of summary judgment regarding the applicable statute of limitations, the court finds that there are no genuine issues as to the following material facts, which are relevant to the determination of whether any of the Trustee's causes of action are time barred.  The

Debtors filed their bankruptcy petition on June 28, 2013.  [Case No. 1:13-bk-13184-SDR, at

Doc. No. 1].  The Trustee instituted this adversary proceeding on June 17, 2015.  [Doc. No. 1].

Five houses located in Hamilton County, Tennessee, were transferred by a recorded deed from

Rhonda Walker's Revocable Trust into Cindy Walker's name in November 2007.  As defined

*supra*, these are the 2007 Transfers.  Five additional houses were transferred by deeds recorded

on October 1, 2008, from Rhonda Walker's Revocable Trust into Cindy Walker's name.  As

defined *supra*, these are the 2008 Transfers.  Five other house purchases were made by Cindy

Walker during the two years preceding her parents' bankruptcy.  As defined *supra*, these are the

Two-Year Transfers.

The Trustee contends that the 2007 Transfers, the 2008 Transfers, and the Two-Year

Transfers were fraudulent and may be avoided and recovered by the Debtors' estates pursuant to

the avoidance powers granted him by 11 U.S.C. §§ 548(a) and 544(b).  [Doc. No. 107-2, at 35].

The Defendants contend that the 2007 and 2008 Transfers are not avoidable as a matter of law

because the Trustee's right to avoid the transfers has been extinguished by the applicable statute

of limitations.  [Doc. 111-1, at 6].

### b. 11 U.S.C. § 548(a)

The Bankruptcy Code gives a trustee authority to avoid transfers made with actual intent

to hinder, delay, or defraud creditors as well as transfers made in which the debtor received less

than a reasonably equivalent value in exchange and was insolvent on the date such transfer

occurred or became insolvent as a result.  11 U.S.C. §§ 548(a)(1)(A)-(B).  A trustee's powers

under section 548 are expressly limited to avoiding only transfers which occurred on or within

two years before the date of the filing of the petition. 11 U.S.C. § 548(a)(1).  In this case, the

only transfers that fall within that period are the Two-Year Transfers.  Accordingly, any claims

made by the Trustee pursuant to this section for recovery of the 2007 or 2008 Transfers are time barred.

### c. 11 U.S.C. § 544(b)(1)

With respect to the Trustee's powers under 11 U.S.C. § 544(b)(1), with certain exceptions not applicable here, "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim." 11 U.S.C. § 544(b)(1). If such a transfer is avoided, the Trustee may recover the property transferred or the value of the property transferred from the transferee. 11 U.S.C. § 550(a). In this case, the Trustee has alleged several bases, under state statutes, that provide the "applicable law" for him to use to avoid the transfers. However, because section 544(b) authorizes him to "stand in the shoes" of the Debtors' unsecured creditors, the Trustee is "subject to the same procedural limitations affecting their right to avoid a particular transfer under the applicable law." *In re Southwest Equip. Rental, Inc.*, 1992 WL 684872, at *10 (E.D. Tenn. 1992). Thus, in order for the Trustee to pursue his fraudulent transfer claims, the applicable statute of limitations must not have run before the Debtors filed their bankruptcy petition. *See id; see also In re NM Holdings. Co, LLC*, 407 B.R. 232, 264 n.127 (Bankr. E.D. Mich. 2009) (noting that if the trustee's complaint is timely filed under 11 U.S.C. § 546(a), "that section has the effect of tolling the running of the state statute of limitations for avoidance claims under § 544(b), as long as the claims were not already time-barred under state law as of the petition date").

Determining the applicable statute of limitations period for the Trustee's state law claims requires more analysis. Tennessee courts have often recited that when determining the applicable statute of limitations in a particular case, the court must ascertain the gravamen of the

complaint. *See Orlando Residence, Ltd. v. Nashville Lodging Co.*, 1996 WL 724915, at *3

(Tenn. Ct. App. 1996) (citing *Vance v. Schulder*, 547 S.W.2d 927, 931 (Tenn. 1977)).  The

Tennessee Supreme Court elaborated on this "rather elliptical phrase," to explain that "in

choosing the applicable statute of limitations, courts must ascertain the gravamen of each claim,

not the gravamen of the complaint in its entirety." *Benz-Elliott v. Barrett Enterps., LP,* 456

S.W.3d 140, 148-49 (Tenn. 2015).  The Tennessee Supreme Court explained that courts are to

employ a two-step approach when determining the gravamen of a claim for the purpose of

choosing the applicable statute of limitations.  The court must first "consider the legal basis of

the claim and then consider the type of injuries for which damages are sought." *Id.* at 151.  The

court will consider each state law claim and then the appropriate statute of limitations applicable

to that claim.

*i. Claims brought under the Tennessee Uniform Fraudulent Transfer Act,
Tenn. Code Ann. §§ 66-3-301 to -313*

The Trustee contends there are two legal bases under Tennessee state law to support his

claims under 11 U.S.C. § 544(b) to avoid the 2007, 2008, and the Two-Year Transfers as

fraudulent conveyances.  The first is the Tennessee Uniform Fraudulent Transfer Act ("TFTA"),

codified at Tenn. Code Ann. §§ 66-3-301 to -313.  That act allows a trustee to recover fraudulent

transfers made with "actual intent to hinder, delay, or defraud" present or future creditors.  Tenn.

Code Ann. § 66-3-305(a)(1).  A trustee may also avoid transfers for which the debtor did not

receive "a reasonably equivalent value in exchange for the transfer or obligation" and that were

made at a time when either: (1) the debtor "[w]as engaged or was about to engage in a business

or a transaction for which the remaining assets of the debtor were unreasonably small in relation

to the business or transaction;" or (2) the debtor "[i]ntended to incur, or believed or reasonably

should have believed that the debtor would incur debts beyond the debtor's ability to pay as they

48

became due." Tenn. Code Ann. § 66-3-305(a)(2).  A trustee may also avoid transfers made by a

debtor if the transfer was made or an obligation incurred without receipt of a "reasonably

equivalent value in exchange" at a time when the debtor was insolvent or became insolvent as a

result of the transfer.  Tenn. Code Ann. § 66-3-306(a).  If a trustee seeks any remedy available

under TFTA section 308, he or she must bring the cause of action within four years after the

transfer was made or the obligation was incurred. Tenn. Code Ann. § 66-3-310.  If the transfer

was made with actual intent to hinder, delay, or defraud creditors, then the limitations period is

extended to one year after the transfer or obligation was or could reasonably have been

discovered by the claimant.  *Id.*

In this case, all of the transfers sought to be avoided involve real property.  The TFTA

provides the appropriate date for determining when the transfer occurred for purposes of

beginning the running of the limitations period.  According to the statutory test, with respect to a

transferred asset that is real property, a transfer is made on the date "when the transfer is so far

perfected that a good-faith purchaser of the asset from the debtor against whom applicable law

permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the

interest of the transferee."  Tenn. Code Ann. § 66-3-307(1)(A).  Here, the applicable dates of

transfer would be the dates the deeds were recorded.  There is no dispute that the date of the

2007 Transfers was in November of 2007, which is more than four years from the date the

bankruptcy was filed.  The undisputed date of the 2008 Transfers was in October of 2008, also a

date more than four years before the bankruptcy filing.  With respect to the Two-Year Transfers,

they clearly fall within the four-year period before the bankruptcy filing.

As with the Trustee's causes of action under section 548, if the causes of action existed at

the time of the bankruptcy filing, the Trustee has an additional period in which to bring the

avoidance action.  In this case, the relevant time period is two years after the entry of the order

for relief. 11 U.S.C. § 546(a)(1)(A).  The Trustee filed this action within that period.  Therefore,

only his causes of action for the 2007 and 2008 Transfers under the TFTA are time barred.

*ii. Claims brought under Tenn. Code Ann. § 66-3-101*

The Trustee's second state law basis for avoiding the transfers is under Tenn. Code Ann.

§ 66-3-101, which provides that:

> Every gift, grant, conveyance of lands, tenements, hereditaments, goods, or
> chattels, or of any rent, common or profit out of the same, by writing or
> otherwise; and every bond, suit, judgment, or execution, had or made and
> contrived, of malice, fraud, covin, collusion, or guile, to the intent or purpose to
> delay, hinder, or defraud creditors of their just and lawful actions, suits, debts,
> accounts, damages, penalties, forfeitures; or to defraud or to deceive those who
> shall purchase the same lands, tenements, or hereditaments, or any rent, profit, or
> commodity out of them, shall be deemed and taken, only as against the person,
> such person's heirs, successors, executors, administrators, and assigns, whose
> debts, suits, demands, estates, or interest, by such guileful and covinous practices,
> shall or might be in any wise disturbed, hindered, delayed, or defrauded, to be
> clearly and utterly void; any pretense, color, feigned consideration, expressing of
> use, of any other matter or thing, to the contrary notwithstanding.

Tenn. Code Ann. § 66-3-101.

Tenn. Code Ann. § 66-3-101 is an old statute which has been used by creditors for over

two hundred years to recover fraudulently conveyed property.  As the court explained in *In re*

*Covington*:

> Tenn. Code Ann. § 66-3-101 derives from the Statutes of 13 Elizabeth (Ch. 5) and
> 27 Elizabeth (Ch. 4). *State v. Nashville Trust Co.,* 28 Tenn. App. 388, 416, 190
> S.W.2d 785, 796 (1944).  Its predecessor was first enacted in Tennessee in 1801.
> *See* 1801 Tenn. Pub. Acts Ch. XXV, § 2.  The current version first appeared in
> 1858.  *See* Tenn. Code § 1759 (1858).  In 1919 the Tennessee legislature enacted
> a uniform fraudulent conveyance law.  *See* 1919 Tenn. Pub. Acts Ch. 125 § 2.
> Currently codified at Tenn. Code Ann. §§ 66-3-301-314, the uniform law
> supplements but does not replace its older relative. *United States v. Kerr,* 470 F.
> Supp. 278, 281 (E.D. Tenn. 1978); *Scarborough v. Pickens,* 26 Tenn. App. 213,
> 218, 170 S.W.2d 585, 587 (1943).

*In re Covington*, 171 B.R. 294, 296 n.3 (Bankr. M.D. Tenn. 1994).

Despite changes in the uniform laws in this area, the older statute appears to have continued viability. In 2003, the legislature deleted part 3 of Title 66 which had been the codification of the Uniform Fraudulent Conveyances Act ("UFCA"), and enacted the Uniform Fraudulent Transfer Act with minor changes. As explained by this district court in *Hickman v. Turitto*:

> The Uniform Fraudulent Transfer Act ("UFTA") replaced the UFCA. The National Conference of Commissioners on Uniform State Laws ("Commissioners") approved and recommended the UFTA for passage by the states in 1984. Unif. Fraudulent Transfer Act Prefatory Note. The statute was drafted with the intent of changing the law to bring it in line with recent changes in bankruptcy, secured transactions, and sales. *Id.*

*Hickman v. Turitto*, No. 1:06-CV-151, 2007 WL 2892788, at *4 (E.D. Tenn. Sept. 28, 2007). Despite the legislature "evinc[ing] the intent [to] harmonize[] their laws with the laws of other states who had previously or [would] subsequently enact the statute" (*id.* at *6) by enacting the uniform law, the legislature did not repeal the older fraudulent transfer sections based on the Statutes of Elizabeth.

This court has found no case law in Tennessee that would lead the court to believe that the enactment of the Uniform Fraudulent Transfer Act repealed the older law. When considering the enactment of the earlier Uniform Fraudulent Conveyances Act, the Tennessee Court of Appeals held that the uniform law did "not repeal" the older statute "but merely enlarge[d]" it. *Scarborough,* 170 S.W.2d at 587; *see also In re Covington*, 171 B.R. at 296 n.3 (noting that "the uniform law supplements but does not replace its older relative") (citations omitted). The court's conclusion is bolstered by the Sixth Circuit's citation to *Scarborough* after the enactment of the TFTA in 2003. It described the relationship of the uniform statute to the older statute as being

"not repeal[ed] but merely enlarged." *Tareco Props., Inc. v. Morriss*, 196 F. App'x 358, 361 n.1 (6th Cir. 2006).

Unlike the TFTA, there is no corresponding statute of limitations for the older fraudulent transfer provision. Therefore, the court must use the *Benz-Elliott* test to determine which limitations period is applicable for the relief the Trustee has requested. Some cases have treated fraudulent transfers as conversion of property sounding in tort. *See In re Southwest Equip. Rental, Inc.*, 1992 WL 684872, at *10-11 (E.D. Tenn. 1992). Tort actions for injuries to personal or real property have a three-year statute of limitations. Tenn. Code Ann. § 28-3-105(1); *Orlando Residence, Ltd. v. Nashville Lodging Co.*, 1996 WL 724915, at *3 (Tenn. Ct. App. May 19, 1997) (three-year statute would apply to fraudulent transfer suit against fraudulent grantor for fraud and deceit). When the creditor seeks to recover the value of the fraudulently transferred property, courts have used the six-year statute of limitations for contracts under a theory that there is an implied contract to pay a fair price. Tenn. Code Ann. § 28-3-109(a)(3); *Orlando Residence, Ltd. v. Nashville Lodging Co.*, 104 S.W.3d 848, 853-54 (Tenn. Ct. App. 2002) ("In some cases, the claim against the fraudulent grantee may be asserted for a period of up to six years on an implied promise to pay for the property to prevent unjust enrichment. In such cases, the creditor is said to have waived the tort and to have sued the purchaser for the value.") (Citations omitted). When the creditor has sought to recover the real property or rescind the transfer, courts have applied the limitations period for actions for the recovery of land taken by adverse possession, which is seven years. Tenn. Code Ann. § 28-2-103(a); *Boro v. Hidell,* 122 Tenn. 80, 120 S.W. 961 (1909), *Ramsey v. Quillen,* 73 Tenn. (5 Lea) 184 (1880); *Jordan v. Marchetti*, No. 01A01-9607-CH-00340, 1997 WL 629955, at *3 (Tenn. Ct. App. Oct. 14, 1997); *Akers v. Gillentine,* 33 Tenn. App. 212, 231 S.W.2d 372 (1950). All other cases not expressly

52

provided for in a relevant statute of limitations must be brought within ten years after the cause of action accrues. Tenn. Code Ann. § 28-3-110(a)(3).

In this case, the court finds that in Count II of the amended complaint the Trustee is first and foremost seeking the return of real property. Alternatively, he is asking for a judgment for its value. The Trustee has cited a number of cases in which a limitations period of six years was found to apply to suits brought under Tenn. Code Ann. § 66-3-101. *See e.g., German Bank v. Haller*, 52 S.W. 807, 808 (Tenn. 1898); *Hallack v. Hawkins*, 409 F.2d. 627, 629 (6th Cir. 1969); *Louis Dreyfus Corp. v. Butler*, 496 F.2d 806 (6th Cir. 1974). The court recognizes that the Sixth Circuit has referred to these cases as "outdated and overruled case law." *Gilmore v. Davis*, 185 F. App'x 476, 482 (6th Cir. 2006). Nevertheless, the court finds that these cases deserve a closer look.

The Sixth Circuit's characterization of these cases as "outdated and overruled" related to how Tennessee's discovery rule for tort actions, adopted in 1975 in *McCroskey v. Bryant Air Conditioning Co.*, 524 S.W.2d 487 (Tenn. 1975), affected those cases' discussion of when the statute of limitations began to run. Upon review of the three cited cases, this court concludes that their discussion regarding the length of the statute of limitations period for fraudulent transfer actions once it has begun to run is still relevant. These court decisions selecting a six- or seven-year statute of limitations period have not been overruled by any Tennessee court. Nor does their reasoning seem outdated.

Considering them in reverse chronological order, the *Dreyfus* case involved transfers of real and personal property to the debtor's wife following the entry of a large judgment against the debtor. The court specifically found that the creditor "knew of the transfers in 1955 and inexplicably chose to let them go unchallenged until 1968." *Louis Dreyfus Corp.*, 496 F.2d at

53

808.  The court found thirteen years to be a "time period . . . greatly in excess of that allowed for the bringing of an action to set aside a conveyance of property.  *Id.* (citing former Tenn. Code Ann. § 28-203 [seven-year limitations period for adverse possession], and § 28-310 [ten-year catch-all statute]).  The court rejected an argument that the statute should have been tolled due to the property having been held in a constructive trust because even under that theory the claim was barred by the six-year statute of limitations with respect to contracts.  *Id.*

The *Hallack* case involved an action by a creditor to recover the value of real property transferred in fraud of creditors.  *Hallack*, 409 F.2d at 628.  The plaintiff had filed suit against the transferor following a tragic automobile accident.  *Id.*  Shortly after the lawsuit was filed, the transferor and his wife executed two notes to his brother, the defendant, and secured the obligations with deeds of trust on their home.  *Id.*  The deeds of trust were properly recorded.  *Id.*  Four years later, the transferor conveyed the property to his brother in satisfaction of one of the notes.  *Id.* at 629.  A year later a judgment was entered against the transferor.  *Id.*  The Sixth Circuit held that:

> There is no question but that the statute of limitations applicable to an action by a creditor against the grantee of his debtor, to recover the value of the personalty fraudulently conveyed is six years.  T.C.A. § 28-309; *German Bank v. Haller*, 101 Tenn. 83, 52 S.W. 807 (1898).  Whether this is true as to an action to recover the value of real property fraudulently conveyed, is unclear.  If the six-year statute is inapplicable, then the ten-year statute (T.C.A. § 28-310) would govern.  We need not decide which statute applies in this case since the result would be the same under either one.  The only question here is, [w]hen does the applicable statute begin to run?"

*Id.* at 630.  Again, the *Hallack* case did not involve an issue of discovery but rather whether the date of the fraudulent transfer was the date of the deed of trust or the date of the quitclaim deed delivered in satisfaction of that deed of trust. The court's conclusion about the length of the applicable limitations period is unaffected by a change in the discovery rule.

54

The third case cited, *German Bank v. Haller*, did not involve a discovery issue either.
Like *Hallack*, the court was faced with which statute of limitations to apply to a fraudulent
transfer of goods. *German Bank*, 52 S.W. at 807. The court specifically found that concealment
had not been "sufficiently alleged, nor [was] it made out in the proof." *Id.* at 808. In that case,
the court differentiated between seeking the return of the actual property and seeking the value of
the property. *Id.* It concluded that an action for recovery of converted personal property must be
brought within three years; however, it also found that a plaintiff could waive the tort and pursue
the value of the transfer under a theory of implied contract which could be brought within six
years from its accrual. *Id.*

The Defendants cite only *In re Stanfill*, No. 3:15-bk-30233-SHB, 2016 WL 3765729, at
*8 (Bankr. E.D. Tenn. July 8, 2016), as authority in support of their contention that a four-year
statute of limitations period applies. [Doc No. 111-1, at 8]. The court notes that the issue of the
appropriate statute of limitations is not addressed by the court in *In re Stanfill*. Rather, that case
addresses the standards for approval of a settlement. In that case, the court merely accepted what
the parties to the settlement were acknowledging. The defendant acknowledged that the
"[t]rustee, could, in fact, bring an adversary proceeding against her to avoid and recover
potentially fraudulent transfers" (*In re Stanfill*, 2016 WL 3765729, at *7), while the trustee
acknowledged that "he could not pursue transfers . . . before 2011 under the longest applicable
statute of limitations." *Id.* at *1 n.4. Upon review, the court does not find recognition of the
parties' apparent agreement to a four-year limitations period to be persuasive authority on the
issue.

Based on the foregoing analysis, the court concludes that Tenn. Code Ann. § 28-2-103(a)
provides the applicable statute of limitations for recovery of the real property in this case. That

statute provides that "No person or anyone claiming under such person shall have any action, either at law or in equity, for the recovery of any lands . . . but within seven (7) years after the right of action accrued."  Tenn. Code Ann. § 28-2-103(a).  The court finds that there is a seven-year statute of limitations for the recovery of the real property under Tenn. Code Ann. § 66-3-101 and a six-year statute of limitations for the recovery of the value of the transfers.  Therefore, the court finds that the Trustee's claims under Tenn. Code Ann. § 66-3-101 for the 2007 Transfers, 2008 Transfers, and Two-Year Transfers, are not barred by the statute of limitations, and the Defendants' motion for summary judgment on that issue is denied.

### 2. Trustee's Avoidance Claims

Having determined which of the Trustee's fraudulent transfer claims are time barred and which are not, the court will proceed to determine whether there are genuine issues of material fact remaining which would preclude summary judgment.

### a. 11 U.S.C. § 548

The court has determined that the only surviving claims that may be brought under 11 U.S.C § 548 are for the Two-Year Transfers.  Section 548(a)(1) provides that:

> The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily —
>
> ....
>
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business
or a transaction, for which any property remaining with the debtor was an
unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would
be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such
obligation to or for the benefit of an insider, under an employment contract and
not in the ordinary course of business.

11 U.S.C. § 548(a)(1).

With respect to whether the Trustee is entitled to summary judgment on his fraudulent

transfer claims brought under 11 U.S.C. § 548(a)(1), the court finds that disputed facts remain on

the following material elements of the claim.  As to (a)(1)(A), the intent of the transfers is in

dispute.  The Trustee contends that the existence of the Debtors' financial difficulties, the

economic conditions existing at the time of the transfers, the discounted sales prices or outright

gifts to a family member, and the Debtors' continued control of the assets are all indications of

fraudulent intent.  Cindy Walker contends that the transfers were her acquisitions of retirement

assets purchased at advantageous prices and on excellent credit terms assisted by concerned

parents motivated by their desire for her well-being and expectation of being repaid, and in

whose management skill she had complete trust.  As the court has previously noted, intent is not

a subject that lends itself to a motion for summary judgment. *Rice v. Morse (In re Morse)*, 524

B.R. 774, 789 (E.D. Tenn. Feb. 2, 2015) (noting that when "subjective intent is at issue,

summary judgment is generally inappropriate unless all reasonable inferences defeat the claims

of the opposing party").  The court will have to decide which set of facts it finds to be true.

With respect to (a)(1)(B), the court will have to decide whether Cindy's acknowledged

obligation to pay for the houses constitutes reasonably equivalent value and whether the other

elements of a constructive fraudulent transfer have been met.  For these reasons, the court will deny summary judgment to both parties as to the Trustee's claims under section 548.

### b. 11 U.S.C. § 544(b) and Tenn. Code Ann. §§ 66-3-301 to -313

The court has determined that the only surviving claims that may be brought under 11 U.S.C § 544(b) and Tenn. Code Ann. § 66-3-301 to -313 are for the Two-Year Transfers. Section 544(b) contains four requirements: "(1)[a] creditor, (2) holding an allowable unsecured claim; and (3) a transfer of an interest of the debtor in property, (4) that is voidable under applicable [state] law." *Lyon v. Eiseman (In re Forbes),* 372 B.R. 321, 330 (B.A.P 6th Cir. 2007) (quoting *Belfance v. Bushey (In re Bushey),* 210 B.R. 95, 100 (B.A.P. 6th Cir. 1997)).  In this case, the first three elements are not in dispute. The disputes all relate to the requirements under applicable state law.

The first basis for avoidance under Tennessee law that the Trustee has alleged is the TFTA.  Tenn. Code Ann. §§ 66-3-301 to -313.  Tenn. Code Ann. § 66-3-305(a)(1) provides for the avoidance of transfers made "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor."  Tenn. Code Ann. § 66-3-305(b) lists eleven factors, or "badges of fraud," to be considered when evaluating actual intent of the transferor.

(1) The transfer or obligation was to an insider;
(2) The debtor retained possession or control of the property transferred after the transfer;
(3) The transfer or obligation was disclosed or concealed;
(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) The transfer was of substantially all the debtor's assets;
(6) The debtor absconded;
(7) The debtor removed or concealed assets;
(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

58

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Tenn. Code Ann. § 66-3-305(b).

The Trustee has demonstrated the existence of various badges of fraud, including the insider relationship of the parties, the failure to disclose some of the transactions in the Debtors' bankruptcy filings, the consideration provided for the transactions, and the existence of litigation at the time the transfers were made. As noted in prior discussion of the intent issue, the Defendants offer an alternative reason for the transfers and contend that they are willing to pay for the value that they received. Summary judgment is not appropriate for this count of the complaint.

If the transfer was made without the debtor "receiving a reasonably equivalent value in exchange for the transfer or obligation" at a time the debtor was insolvent, it is avoidable under Tenn. Code Ann. § 66-3-306(a). Tenn. Code Ann. § 66-3-305(a)(2) contains the same requirement for evidence of an insufficient exchange of value, but rather than insolvency, it requires a showing that the debtor "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," or that the debtor "[i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." Tenn. Code Ann. § 66-3-305(a)(2)(A)-(B). Whether the Defendants and the Debtors exchanged reasonably equivalent value through an unwritten understanding that Cindy Walker would pay for any house she received is a disputed fact. Consequently, the court will not grant the Trustee's request for summary judgment. The court also believes that, given the

statements in the Trustee's affidavit regarding the Debtors' financial condition, he has

sufficiently established insolvency to overcome the Defendants' request for summary judgment.

### c.  11 U.S.C. § 544(b) and Tenn. Code Ann. § 66-3-101

Having determined that the Trustee's claims to any of the fifteen transfers under Tenn.

Code Ann. § 66-3-101 are not time-barred, the court will now look to the substance of the

Trustee's claims under that statute.  For the Trustee to prevail on his claim under Tenn. Code

Ann. § 66-3-101, he must prove specific intent to defraud creditors.  *See* Tenn. Code Ann. § 66-

3-101.  Evidence of intent may be circumstantial, and the court must determine the existence of

intent from the facts and circumstances of each case.  Tennessee courts have recognized that

fraudulent conveyance cases are fact intensive.

> Whether a transfer is fraudulent is determined by the facts and circumstances of each
> case.  Gibson's *Suits in Chancery,* (5th Ed. 1955) § 1057, p. 328, states: "Inasmuch as
> frauds are generally secret, and have to be tracked by the footprints, marks, and signs
> made by the perpetrators, and discovered by the light of the attending facts and
> circumstances, these evidences are termed 'badges of fraud.'"

*Macon Bank & Trust Co. v. Holland*, 715 S.W.2d 347, 349 (Tenn. Ct. App. 1986).

A list of those badges is found in *Stevenson v. Hicks (In re Hicks)*, 176 B.R. 466, 470

(Bankr. W.D. Tenn. 1995)).

> Many "badges of fraud" have been identified by the Tennessee Appellate Courts to assist
> trial Courts in determining a debtor's intent for fraudulent conveyance purposes. The
> badges of fraud are as follows:
>
> 1. The transferor is in a precarious financial condition.
> 2. The transferor knew there was or soon would be a large money judgment
> rendered against the transferor.
> 3. Inadequate consideration was given for the transfer.
> 4. Secrecy or haste existed in carrying out the transfer.
> 5. A family or friendship relationship existed between the transferor and the
> transferee(s).
> 6. The transfer included all or substantially all of the transferor's nonexempt
> property.
> 7. The transferor retained a life estate or other interest in the property transferred.

60

8. The transferor failed to produce available evidence explaining or rebutting a suspicious transaction.
9. There is a lack of innocent purpose or use for the transfer.

*In re Hicks*, 176 B.R. at 470 (citations omitted).  "The presence of one or more of the badges of fraud gives rise to a presumption of fraud and consequently shifts the burden of disproving fraud to the defendant."  *Holcomb Health Care Servs., LLC v. Quart Ltd., LLC (In re Holcomb)*, 329 B.R. 622, 671 (Bankr. M.D. Tenn. 2004) (citations omitted).

As noted above, the Trustee has alleged several badges of fraud.  The Defendants have offered an explanation for the motivation behind all of the transfers.  The court finds that the intent of the parties in making these transfers is in dispute.  Questions of intent are not generally appropriate for summary judgment.  *See In re Morse*, 524 B.R. at 789.  As with the TFTA claim, the Trustee has established the existence of various badges of fraud and the Defendants have come forward with an explanation which will require the court to determine the credibility of that explanation.  For these reasons, the court will deny summary judgment to both parties on the Trustee's claims brought pursuant to 11 U.S.C. § 544(b) and Tenn. Code Ann. § 66-3-101.

### C.    *Obligations Due*

If the court should find that the 2007, 2008, and the Two-Year Transfers were made on account of antecedent debt and not with the intent to hinder, delay, or defraud creditors, the Trustee argues that he is entitled to summary judgment based on his theory that the Defendants have unpaid obligations due on the debt incurred for each house transfer.  [Doc. No. 107-2, at 38].  The Defendants also seek summary judgment on the basis that the Trustee cannot prove the amount owed.  [Doc. No. 111-1, at 3].

1.    *Legal Standard for Collection of Debt / Burden of Proof*

The Defendants seek summary judgment in this case not because they contest that

obligations exist, but rather because they contend that the Trustee cannot prove the exact amount

that is owed.  They rely on Tennessee law regarding the debtholder's burden of proof.

"In an action to collect a debt, the plaintiff creditor bears the burden of proving the

existence of the debt and that the debtor is indebted to the creditor in a certain amount." *LVNV*

*Funding, LLC v. Mastaw*, No. M2011-00990-COA-R3-CV, 2012 WL 1534785, at *5 (Tenn. Ct.

App. Apr. 3, 2012) (citing *Bellsouth Adver. & Publ. Corp. v. Wilson*, No. M2006-00930-COA-

R3-CV, 2007 WL 2200170, at *5, (Tenn. Ct. App. July 30, 2007)); *see also Marsh & McLennan,*

*Inc. v. T.J. & L. Constr. Co.*, No. 02A01-9110-CH-00234, 1992 WL 67896, at *4 (Tenn. Ct.

App. Apr. 7, 1992) ("As the claimant on debts allegedly owed by TJL, Marsh has the burden of

proving that such debts, in fact, are owed. . . .").  The creditor must meet this burden by

introducing evidence sufficient to establish the debt by a preponderance of the evidence.  *See*

*Bellsouth Adver. & Publ. Corp.*, 2007 WL 2200170, at *5.

Once an obligation is established, if the obligor alleges that some or all of the amounts

owed have been paid, as the Defendants do in this case, the burden then shifts to the obligor to

establish proof of payment.  *See Marsh & McLennan, Inc.*, 1992 WL  67896, at *4 (finding that

obligor "has the burden of showing that it has made payment on any debts which are proven")

(citing 1 C.J.S. Account, Action On § 28 (1985)); *see also Mason v. Spurlock*, 63 Tenn. 554, 563

(1874); *French v. Stubblefield*, 56 S.W. 32, 34 (Tenn. Ch. App. 1900).

The court finds the case of *Community First Bank and Trust v. Velligan Family Trust*,

No. M2014-00370-COA-R3-CV, 2015 WL 1955431 (Tenn. Ct. App. May, 1, 2015), *perm. app.*

*denied* (Tenn. Sept. 16, 2015), as illustrative of this shifting burden.  In that case, the defendants

were obligors on four notes upon which the plaintiff bank sought judgments for unpaid balances

owed under the notes. *Id.* at *1. The bank moved for summary judgment and in support

attached, *inter alia*, the notes, forbearance agreements, deeds of trust, notices of default, and

affidavits from one of its officers. *Id.* at *2. The trial court granted summary judgment after

finding that the supporting documentation established the unpaid balances and that the "unpaid

balances on the [l]oans and the resulting deficiencies are not in dispute. . . ." *Id.* On appeal, the

Tennessee Court of Appeals explained the burden shifting framework for summary judgment:

> In an action to collect a debt, the plaintiff creditor bears the burden of proving the
> existence of the debt and that the debtor is indebted to the creditor in a certain
> amount. Accordingly, as the party moving for summary judgment, the Bank had
> the initial burden to demonstrate the elements required to support its claim that it
> was entitled to the unpaid indebtedness owing under each note, as well as post-
> maturity interest and the costs of collection. The [bank officer's] affidavits,
> which we have concluded were proper for the trial court's consideration at
> summary judgment, established the existence and amount of default for each note.
> As a consequence, the burden of production then shifted to the [defendants] to
> demonstrate a genuine dispute as to the amount of indebtedness owed to render
> summary judgment inappropriate.

*Id.* at *4 (footnotes and citations omitted).

> 2.    *Analysis of Payment Obligation*

The Trustee's primary contention in this case is that the Defendants' ownership of the

sixteen houses is a sham and the result of transfers made to her to hinder, delay, or defraud the

Debtors' creditors. It is the Defendants who raise the existence of the debt as a defense to the

fraudulent transfer obligations. As discussed above, providing a benign explanation for transfers

made where badges of fraud are present is the Defendants' burden. Why Cindy purchased the

houses, what she promised to pay for them, and what she has paid to this point are all seemingly

part of her evidence to prove that defense. However, the Defendants request summary judgment

based on the Trustee's failure to carry his burden as the debtholder to prove the existence of the

debt and the amount owed.  The Defendants' argument fails to recognize that, to the extent that

the amount is in dispute because of failure to credit payments, it is the obligor's burden to prove

those payments.

In support of his motion for summary judgment, the Trustee submitted, *inter alia*, his

own affidavit, bank account records for a number of relevant individuals and entities

accompanied by an affidavit of the custodian of those records, a statement of undisputed facts,

Defendants' written responses to interrogatories, transcripts from the depositions of Cindy

Walker, Don Walker, and Rhonda Walker, Janice Long, and John Ramsey, and portions of

Cindy Walker's tax returns. [Doc. Nos. 108-110].  The Trustee also submitted the affidavit and

report of Mr. Shumway, which contains his calculation of the amounts due supported by

exhibits, including, *inter alia*, deeds of trust, notes, accounting entries, and bank account records

relevant to the transactions in question.  [Doc. No. 109].  The court has reviewed these

documents in great detail.

As for the Trustee's proof of an amount due, the parties have agreed for purposes of this

count that Cindy Walker was supposed to pay her mother for the ten houses she obtained in 2007

and 2008.  The Trustee started with the number provided in their testimony and has given credits

for amounts withdrawn by Rhonda from the Client Management account and for gift tax

exclusions for the years 2007, 2008, and 2009 toward the 2007 Transfers obligation.  The

Defendants admit the existence of a note reflecting the obligation for the 2008 Transfers, and the

parties have agreed as to what payments have been made toward that note.  The Trustee has also

proffered a calculation prepared by his expert, Mr. Shumway, stating that the balances due for

the 2007 and 2008 Transfers are $444,845 and $374,150, respectively.  [Doc. No. 109-3,

Affidavit of Spence Shumway, Ex. B., Appx. C & D].  The Trustee has provided a calculation

for the amount owed on the note for 2210 Red Tail Lane of $286,682. [*Id.* at Appx. E].

As for the remaining houses, the parties have not stipulated to a starting price for the debt

obligation because they even dispute the source of funds.  Their theory appears to be that Cindy

would not owe what she did not need to borrow.  The Trustee and his expert have provided the

sources of some or all of the funds for the remaining houses.

As for 1608 Bush Road, the $114,128.24 purchase price can be traced back to Don and

Rhonda Walker's accounts. [*See supra*, § IV, B. Facts; Doc. No. 109-3, Affidavit of Spence

Shumway, Exhibit B, Appx. F-1].

As for 4044 Homer Road, the trustee has traced $7,675.60 to the Walker Client

Management account but there is no charge against Cindy Walker's individual account for the

transaction.  [*See supra*, § IV, B. Facts; Doc. No. 109-3, Affidavit of Spence Shumway, Exhibit

B, Appx. F-2]. The remainder of the purchase price was seller financed and the payments were

made from the Client Management account and charged to Cindy's account.  The Trustee seeks

recovery of $169,000 as the value of the house but does not state how much is owed under the

debt obligation theory.  A conclusion as to the price is contingent on a determination of what

portion of the funds used to pay for the purchase were proceeds of fraudulent transfers.

However, without that calculation it would appear that only $7,675.60 was borrowed on March

27, 2012.

As for 142 Brentley Woods, the fact pattern is not like the other transactions where there

is only one transaction to analyze.  The borrowings related to the source of its purchase begin

with $40,000 paid in October of 2009 that did not come from Cindy Walker's Client

Management account.  [*See supra*, § IV, B. Facts; Doc. No. 109-3, Affidavit of Spence

Shumway, Exhibit B, Appx. F-3]. The parties dispute the source of these funds. The subsequent increases in value to the value shown in the like-kind exchange with her parents appear to be the result of favorable transaction flips. The last like-kind exchange was with her parents, and they may have assisted her purchase of the property by agreeing to a sale at a below market price. [*See id.*]. The Trustee does not have a specific amount he seeks for these amounts provided to assist with the purchase of this house.

As for 9004 Fuller Road and 6861 Standifer Gap Road, the Trustee has traced all of the funds used for the purchase of the houses to Don and Rhonda Walker. He seeks $150,965. [*See supra*, § IV, B. Facts; Doc. No. 109-3, Affidavit of Spence Shumway, Exhibit B, Appx. F-4]. Between Cindy and Rhonda's testimony and the terms of the written note, the court finds that the Trustee has sufficiently established an amount owed to overcome the Defendants' motion for summary judgment.

The court also finds that there are genuine issues of material fact remaining which overcome the Trustee's motion for summary judgment on the obligation due. The Trustee provided the calculation of the amount owing on the 2007 Transfers by his expert in which he contends that the amount due is $444,845. [Doc. No. 109-3, Affidavit of Spence Shumway, Exhibit B, Appx. C]. The Defendants' expert, Jack London, CPA, challenges Mr. Shumway's disregard of a $125,000 downpayment, his choice of interest rate, his limitation of the gift tax exclusion after 2010, and his disregard of an additional payment from the sale of the Colemere property. The Defendants' expert contends the calculation should have resulted in an amount due of only $74,963. [Doc. No. 111-12, Rebuttal Expert Report of Jack London, at 10, 26].

A similar dispute about credits exists with respect to the 2008 Transfers although both parties have the benefit of a written record of the parties' agreement regarding the timing of

payments, treatment of the gift tax exclusion, and the applicable interest rate.  Mr. London states

that the amount due is $217,294.  [*Id*. at 9, 26].

With respect to the remaining houses, there are additional factual disputes about whether

Cindy Walker actually paid for these houses to begin with and what credits should have been

given. Because factual disputes remain as to these houses, the court will deny the Trustee's

motion for summary judgment.

### D.    *2210 Red Tail Lane*

As the Trustee's final request in his motion for summary judgment, he asks for an

"[o]rder that the note signed by Cindy Walker on August 3, 2009 as to 2210 Red Tail Lane [be]

declared valid, due and owing and enforceable; also that the balance due on the note as of August

31, 2016 is $286,682.00." [Doc. No. 107, at 2].

The note obligation arises from an agreement between Cindy Walker and her father for

her to purchase 2210 Red Tail Lane with the proceeds of 30 Woodlawn.  Cindy Walker had sold

a property to a third party and had approximately $120,000 in cash proceeds, which she paid to

Don Walker towards the purchase of 2210 Red Tail Lane.  [Don Walker Dep., 6/13/2016, Ex. 2,

Doc. No. 110, at 8].  Cindy Walker signed a promissory note for $79,893.50 to Don Walker for

the remaining amount owed on 2210 Red Tail Lane, and the note was secured by a deed of trust

on the property.  [Don Walker Dep., 6/13/2016, Ex. 3, Doc. No. 110, at 8; Cindy Walker Dep.,

6/10/2016, Doc. No. 110-3, at 36; Cindy Walker Dep., 7/21/2016, Doc. No. 110-4, at 50-51].

The Trustee has thus provided evidence that the price set by the parties for 2210 Red Tail Lane

was $200,000.  The Trustee has provided a copy of the executed note and the executed deed of

trust signed by Cindy Walker and recorded with the Hamilton County, Tennessee, Register of

Deeds as an attachment to the Affidavit of Mr. Shumway.  [Doc. No. 109-3, Ex. B, App. E].  Mr.

Shumway calculates that $286,682 is due under the terms of the note.  [Doc. No. 109-3, Ex. B,

App. E, at C-2].

    Although there is no dispute that a written note exists secured by the Red Tail property,

that it was executed by Cindy Walker for the purchase of this property, and that it was delivered

to Don Walker, the Defendants deny that the obligation is valid, due and owing, and enforceable.

Cindy Walker testified that her father never intended for her to pay the note.  [Cindy Walker

Dep., 7/21/2016, Doc. No. 110-4, at 52].  Cindy testified that Don had received a similar amount

under a lease purchase agreement that he had had with another individual and that the "note was

created, because he didn't need another [$]79,000 but the sale price needed to look like

[$]200,000."  [Cindy Walker Dep., 6/10/2016, Doc. No. 110-3, at 42].  In a later deposition, she

supplemented that explanation for using the price of $200,000 rather than what was actually

paid, stating that, "I think the reason was because it was worth more, and so that would've

looked bad to have a property sold at so little in our neighborhood because it's worth more, much

more than that."  [Cindy Walker Dep., 7/21/16, Doc. No. 110-4, at 52-53].

    The court will have to determine at trial whether this testimony is credible and if so

whether there was ever a meeting of the minds that would have created an enforceable obligation

for Cindy Walker to pay and that it was the parties' intention all along to convey the property to

Cindy for less than its value.

### E.    Resulting Trust

    In his amended complaint at Count III, the Trustee seeks alternative relief by asking the

court to "impose a resulting trust for the benefit of the estate on any of the property sought to be

recovered in this complaint, or any additional notes or interests in assets held by the Defendants

where the Trustee's proof shows that the Debtors are the equitable owners of same."  [Doc. No.

31, at 15-17]. The Trustee did not move for summary judgment on this count; however, the

Defendants did move for summary judgment. [Doc. No. 111-1, at 18-21]. The Defendants argue

that the undisputed facts show that the parties lacked the requisite intent at the time each transfer

was made to establish a resulting trust. [*Id.*]

Tennessee law recognizes resulting trusts as "a tool of equity available to courts to

prevent a failure of justice." *Little v. Watson*, No. M2001-00230-COA-R3-CV, 2002 WL

31467471, at *2 (Tenn. Ct. App. Nov. 6, 2002) (citing *Estate of Wardell ex rel. Wardell v. Daily*,

674 S.W.2d 293, 295 (Tenn. Ct. App. 1983)); *see also Classic Refinery, Inc., v. United States*,

No. 1:97-CV-500, 1999 WL 314812, at *4 (E.D. Tenn. Apr. 5, 1999) (citations omitted). This

equitable device is used by courts to prevent unjust enrichment. *In re Estate of Nichols,* 856

S.W.2d 397, 401 (Tenn. 1993). By imposing a resulting trust, a court may "reach an interest in

property belonging to one person yet titled in and held by another." *Partin v. Partin*, No. E2010-

01662-COA-R3-CV, 2011 WL 1485615, at *5 (Tenn. Ct. App. Apr. 20, 2011) (quoting *Smalling*

*v. Terrell,* 943 S.W.2d 397, 400 (Tenn. Ct. App. 1996)).

The Tennessee Supreme Court has provided the following guidance regarding the

creation and application of a resulting trust:

> The imposition of a resulting trust is an equitable remedy; the doctrine of
> resulting trust is invoked to prevent unjust enrichment. Such a trust is implied by
> law from the acts and conduct of the parties and the facts and circumstances
> which at the time exist and surround the transaction out of which it arises.
> Broadly speaking, a resulting trust arises from the nature or circumstances of
> consideration involved in a transaction whereby one person becomes invested
> with a legal title but is obligated in equity to hold his legal title for the benefit of
> another, the intention of the former to hold in trust for the latter being implied or
> presumed as a matter of law, although no intention to create or hold in trust has
> been manifested, expressly or by inference, and there ordinarily being no fraud or
> constructive fraud involved.
>
> While resulting trusts generally arise (1) on a failure of an express trust or
> the purpose of such a trust, or (2) on a conveyance to one person on a

> consideration from another — sometimes referred to as a "purchase-money
> resulting trust" — they may also be imposed in other circumstances, such that a
> court of equity, shaping its judgment in the most efficient form, will decree a
> resulting trust — on an inquiry into the consideration of a transaction — in order
> to prevent a failure of justice. However, the particular circumstances under which
> a resulting trust may arise varies from jurisdiction to jurisdiction.

*In re Estate of Nichols,* 856 S.W.2d at 401 (quoting 76 Am. Jur. 2d *Trusts* § 166, pp. 197–98

(1992)).

Courts have explained that the underlying principle of a resulting trust is that "a trust

follows or goes with the real consideration, or results to him from whom the consideration

actually comes; that the owner of the money that pays for the property should be the owner of the

property." *Brewer v. Brewer*, M2010-00768-COA-R3-CV, 2011 WL 532267, at *6 (Feb. 14,

2011) (quoting *Smalling* 943 S.W.2d at 400). "A resulting trust is generally imposed 'in

accordance with the actual or assumed intention of the parties.'" *Id.* (quoting *Burleson v.

McCrary*, 753 S.W.2d 349, 352-53 (Tenn. 1988).

The type of resulting trust alleged by the Trustee in this case is a purchase money

resulting trust, which arises when "property is purchased and the title [is] taken in the name of

one person, but the purchase price is paid by another." *Classic Refinery, Inc.*, 1999 WL 314812,

at *4 (quoting *Browder v. Hite*, 602 S.W.2d 489, 492 (Tenn. App. 1980)). As the court

explained in *Classic Refinery, Inc.*:

> The key fact necessary to create a purchase money resulting trust is that the
> person who claims a resulting trust, in fact, paid the purchase price: "The source
> and underlying principle of all resulting trusts is the equitable theory of
> consideration. That theory is that the payment of a valuable consideration draws
> to it the beneficial ownership; that a trust follows or goes with the real
> consideration, or results to him from whom the consideration actually comes; that
> the owner of the money that pays for the property should be the owner of the
> property." [*Greene v. Greene*, 272 S.W.2d 483, 487 (Tenn. App. 1954)]. A
> resulting trust arises "out of the state of facts existing at the time of the purchase,
> and attach[es] to the title at that time, and [does] not arise out of any subsequent
> contract or transaction." *Id.* (citation omitted).

*Id.* at *5.

Resulting trusts may be proven by parol evidence. *Nichols*, 856 S.W.2d at 402; *see also*

*Little*, 2002 WL 31467471, at *3 (citations omitted).  However, the burden of proof lies with the

proponent of a resulting trust and must be proven by clear, cogent, and convincing evidence.

*Nichols*, 856 S.W.2d at 402-03.  As the Tennessee Supreme Court explained in *Nichols*:

> [I]t must be sustained by proof of the clearest and most convincing character.  To
> sustain a resulting trust upon parol evidence in the teeth of the terms of the written
> instrument, it is not essential that the evidence be of a character to remove all
> reasonable doubt, but only that it be so clear, cogent and convincing as to
> overcome the opposing evidence, coupled with the presumption that obtains in
> favor of the written instrument.

*Id.* (citations omitted).  The clear, cogent, and convincing standard of proof is an intermediate

standard lying between the preponderance of evidence standard and the reasonable doubt

standard used in criminal trials.  *Little*, 2002 WL 31467471, at *3 (citing *Estate of Acuff v.

O'Linger,* 56 S.W.3d 527, 534 (Tenn. Ct. App. 2001)); *see also Stagner v. Stagner,* No. W2009-

01749-COA-R3-CV, 2010 WL 3717030, at *10 (Tenn. Ct. App. Sept. 23, 2010).  "Under that

standard, the party with the burden of proof must persuade the factfinder that his factual

contentions are 'highly probable.'" *Little*, 2002 WL 31467471, at *3 (quoting *Estate of Acuff*, 56

S.W.3d at 537).

The Defendants contend that they are entitled to summary judgment because the intent of

Cindy Walker and the Debtors at the time of each transfer was for her to hold title and pay for

the houses.  [Doc. No. 111-1, at 20].  However, as with the other counts, intent is not a matter

that lends itself to summary judgment.  The court will need to weigh the credibility of the parties

as well as the disputed facts and disputed inferences that might be drawn from the circumstances

at the time of the transfers before determining whether to impose this equitable remedy.  For

example, the Trustee has offered the following facts in support of his contention that the Debtors intended to retain a beneficial interest. Cindy Walker was not involved in the decision to obtain any specific house. The Debtors made all decisions regarding the properties including the sale of properties such as Grays Drive, where Don Walker Construction received the sale proceeds and Colemere Drive where the proceeds were not credited to Cindy's account. According to Rhonda, the rentals were used as a family fund. [Rhonda Walker Dep., 6/13/2016, Doc. No. 110-6, at 98-100]. The court finds that summary judgment is not appropriate and denies the Defendants' motion.

### VI.    Conclusion

Based on the foregoing review of the pleadings and supporting evidence, and for the reasons stated throughout this opinion, the court makes the following rulings:

#### A.    *Count I – Substantive Consolidation*

With respect to Count I of the amended complaint seeking substantive consolidation [Doc. No. 31, at 13-14], the court will deny the Defendants' motion for summary judgment. The court finds that it has the authority to substantively consolidate the real estate assets of Cindy Walker with the Debtors' estates under 11 U.S.C. § 105(a). Having found that it has the authority, the court also finds that there are genuine issues of material fact regarding whether there is substantial identity between Cindy Walker and the Debtors and whether the benefits of consolidation heavily outweigh the harm caused by the imposition of the remedy. The court will therefore also deny the Trustee's motion for summary judgment.

#### B.    *Count II – Avoidance of Fraudulent Transfers*

With respect to Count II of the amended complaint seeking avoidance of fraudulent transfers [Doc. No. 31, at 15], the court will grant summary judgment to the Defendants on subparts (b), (c), (d), and (e) with respect to the 2007 and 2008 Transfers on the basis that the

applicable statute of limitations bars the Trustee's recovery. However, the court will deny summary judgment to the Defendants on subpart (a) because the Trustee's avoidance action under Tenn. Code Ann. § 66-3-101 is not time barred. The Defendants have also requested summary judgment as to all transfers under subparts (c) and (e) based on the Trustee's inability to prove insolvency. The court will deny the Defendants summary judgment because it finds that the Trustee has made a sufficient showing to overcome the motion.

The court will also deny the summary judgment requested by the Trustee under subpart (a) on the basis that issues of fact remain with respect to intent. With respect to the transfers that are not time barred, i.e., the Two-Year Transfers, the court will deny the Trustee's motion for summary judgment as to subparts (b), (c), (d), and (e). With respect to subparts (b) and (d), the court finds that issues of fact remain with respect to intent. With respect to subparts (c) and (e), issues of fact also remain regarding whether the transferors, Rhonda and/or Don Walker, were insolvent or made insolvent at the time of the transfers for any transfer prior to May 2013.[15] There also exist genuine issues of material fact as to whether equivalent value was received in the form of debt obligations or other consideration for all of the Transfers.

### C.    Count IV – Obligations Due

With respect to Count IV of the amended complaint [Doc. No. 31, at 16], the court will deny both the Trustee's and the Defendants' motions for summary judgment. There are factual disputes regarding whether the parties actually created a debt obligation at the time of the transfers. There are factual disputes regarding the original principal amounts, the accrual of interest, and the credits provided.

---

[15] The court previously held that the Debtors were insolvent on May 17, 2013, the date of the transfer of 9004 Fuller Road and 6861 Standifer Gap Road. [Case No. 1:14-ap-1051-SDR, Doc. Nos. 25-26].

### D.    2210 Red Tail Lane

With respect to the Trustee's motion seeking a judgment that the note on 2210 Red Tail Lane is a valid debt, due and owing to the estate [Doc. No. 107, at 2], the court will deny the Trustee's motion for summary judgment.  The court finds that factual issues remain in dispute as to whether Don Walker and Cindy Walker intended to create an enforceable obligation.

### E.    Resulting Trust

With respect to Count III of the amended complaint seeking the imposition of a resulting trust [Doc. No. 31, at 15-16], the court will deny the Defendants' motion for summary judgment. The court finds that genuine issues of disputed fact remain as to whether the Debtors intended to keep the properties despite conveying them to Cindy, regardless of whether the transfer was done to avoid creditors.

A separate order will enter.